■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v BRETT K. LURIE and B.K.L. MANAGEMENT, INC., Appellants. [673 NYS2d 60] —Judgments, Supreme Court, New York County (Bonnie Wittner, J.), rendered April 25, 1995, convicting defendant Brett K. Lurie, after a jury trial, of eight counts of scheme to defraud in the first degree, nine counts of intentional real estate securities fraud, three counts of grand larceny in the second degree, three counts of grand larceny in the third degree, and offering a false instrument for filing in the first degree, and sentencing him to concurrent terms of 1 to 3 years on three of the scheme to defraud convictions (counts 1-3), and the real estate securities fraud, larceny and offering a false instrument for filing convictions, to run consecutively to concurrent terms of 1 to 3 years on the remaining five scheme to defraud convictions (counts 4-8), for an aggregate sentence of 2 to 6 years, and convicting B.K.L. Management, Inc. of five counts of scheme to defraud in the first degree, and imposing an aggregate fine of $50,000, unanimously affirmed.

Defendant Brett Lurie and his exclusively owned corporation B.K.L. Management, Inc. were criminally prosecuted by the New York State Attorney-General's Office for engaging in a deliberate scheme to defraud the minority shareholders of five residential cooperative buildings (co-ops), which were sponsored and managed by the defendants. The People's evidence established that between April 1989 and December 1990, the defendants and their agents defrauded the minority shareholders of the co-ops by obtaining their monthly maintenance payments, while simultaneously and secretly defaulting on their own financial obligations. Defendant Lurie systematically failed to make the payments on the mortgages underlying the five co-ops, failed to make the maintenance payments to the co-op for his unsold shares and failed to pay bills for water, oil and taxes. By October 1990, Lurie owed $1.8 million in mortgage, maintenance and other fees to the five co-ops. Despite this enormous debt, Lurie consistently paid himself a $15,000 monthly management fee from the co-op's bank accounts, resulting in income to defendants of over $435,000.

The existence of these defaults was never disclosed to the minority shareholders in financial reports or at board meetings, despite the fact that Lurie, as majority shareholder, controlled each board. Defendants also failed to disclose the massive debt and perilous financial situation of each co-op to potential purchasers of co-op shares, either verbally or by

timely and accurate amendments to the cooperative offering plans. Several purchasers and minority shareholders testified at trial that they relied on the defendants' or their agents' misrepresentations of the co-ops' financial strength in purchasing their shares, or in making their monthly maintenance payments. Although amendments disclosing the defaults were submitted by defendants to the Department of Law prior to most of these sales and payments, the purchasers and shareholders were unaware of this because the amendments had not yet been accepted for filing. Ultimately, foreclosure actions were commenced based on the defendants' default on the mortgages for each of the five co-ops, and at least two of the co-ops are, or were, the subject of bankruptcy proceedings.

The verdict was based on legally sufficient evidence and was not against the weight of the evidence. In order to prove defendants' guilt of scheme to defraud in the first degree under Penal Law § 190.65 (1) (b), the People were required to prove that defendants "engage[d] in a scheme constituting a systematic ongoing course of conduct with intent to defraud more than one person or to obtain property from more than one person by false or fraudulent pretenses, representations or promises, and so obtain[ed] property with a value in excess of one thousand dollars from one or more such persons." Similarly, General Business Law § 352-c (5) (Martin Act; General Business Law, art 23-A, § 352 *et seq.*) prohibits almost precisely the same fraudulent conduct, except that there must be an intent to defraud or to obtain property from "ten or more persons," and the property must be obtained by a defendant engaged in a transaction in securities.

The evidence at trial overwhelmingly established that defendants and their agents fraudulently sold shares in the co-ops and collected maintenance payments without ever disclosing the massive defaults on the co-ops' obligations. Defendants' conduct in these circumstances is in direct conflict with the purposes of the Martin Act, which is to "protect the public and prevent fraud in the offering of securities" (*Phoenix Tenants Assn. v 6465 Realty Co.*, 119 AD2d 427, 429). "Implicit in the statutory mandate is a legal obligation on the sponsor of a cooperative conversion plan to accurately and thoroughly disclose the potential risks involved [citations omitted]" (*supra*, at 429; *see also, State of New York v Fashion Place Assocs.*, 224 AD2d 280, 281, *lv dismissed* 89 NY2d 917; *State of New York v Manhattan View Dev.*, 191 AD2d 259).

To this end, the Martin Act requires sponsors of real estate syndication offerings to file an "offering statement" with the

Department of Law detailing the terms of the transaction "as will afford potential investors * * * an adequate basis upon which to found their judgment and shall not omit any material fact or contain any untrue statement of a material fact" (General Business Law § 352-e [1] [b]; *see, Council for Owner Occupied Hous. v Abrams*, 72 NY2d 553, 557; *Matter of Gonkjur Assocs. v Abrams*, 82 AD2d 683, 687-688, *affd* 57 NY2d 853). Until the Department of Law accepts the offering plan for filing, the Martin Act expressly forbids the offer or sale of real estate securities (General Business Law § 352-e [2]). Further, the regulations promulgated by the Attorney-General pursuant to the Martin Act (General Business Law § 352-e [6]) require that when the offering statement no longer provides accurate and complete information due to a change in circumstances, it "must be amended promptly" (13 NYCRR 18.5 [a] [1]). The jury, by its verdict, obviously concluded that defendants engaged in a scheme to sell shares in these five co-ops based on outdated and inaccurate information, and that the filing of the amendments did not negate defendants' fraudulent intent. The record fully supports both of the jury's conclusions.

We further find the evidence sufficient on the convictions on the remaining Martin Act and Penal Law counts. As opposed to a fraudulent scheme, these counts pertain to individual instances where Lurie obtained property from the victims by fraudulent representations or pretenses (*see,* General Business Law § 352-c [6]; Penal Law §§ 155.40, 155.35), or where he offered a false instrument for filing (Penal Law § 175.35). Contrary to defendants' arguments, the evidence established both that a "taking" of property occurred, and that the acts and omissions of Lurie and his agents established an intent to defraud (*see, Kuo Feng Corp. v Ma*, 248 AD2d 168; *People v Kaminsky*, 127 Misc 2d 497, 501-503 [Sup Ct, NY County 1985]).

Defendant raises multiple claims regarding the testimony of the prosecution's expert witness, Mary DiStephan, an Assistant Attorney-General assigned to the Real Estate Finance Bureau. DiStephan testified as an expert witness in the Grand Jury and at trial regarding basic co-op terminology, how buildings are converted to co-ops, the obligations of the sponsor during and after the conversion process, the review of conversions and amendments by the Department of Law and the disclosure and other regulatory requirements of the Martin Act. Although DiStephan never testified that defendants had committed a crime or were in violation of the Martin Act, defendants contend that her testimony was the functional equivalent, and thus, improperly usurped the province of the jury and the court.

Expert testimony is admissible in the court's discretion where "it would help to clarify an issue calling for professional or technical knowledge, possessed by the expert and beyond the ken of the typical juror" (*De Long v County of Erie*, 60 NY2d 296, 307; *see also, Selkowitz v County of Nassau*, 45 NY2d 97). While expert testimony on issues of law is generally inadmissible (*People v Johnson*, 76 AD2d 983; *United States v Bilzerian*, 926 F2d 1285 [2d Cir 1991], *cert denied* 502 US 813), courts have allowed carefully circumscribed expert testimony regarding complicated regulatory requirements, as long as it is consistent with the court's view of the law and does not give a legal conclusion (*see, United States v Bilzerian, supra*, at 1294; *United States v Unruh*, 855 F2d 1363, 1376 [9th Cir 1987], *cert denied sub nom. Forde v United States*, 488 US 974; *United States v Fogg*, 652 F2d 551, 556-557 [5th Cir 1981], *cert denied* 456 US 905; *see*, Note, *Expert Legal Testimony*, 97 Harv L Rev 797).

In the present case, expert testimony was necessary to explain the complicated regulatory scheme governing co-op conversions and the corresponding disclosure requirements imposed on sponsors. The witness explained the conversion process and the statutory requirements, and informed the jury of the nature and timing of defendants' disclosures. She never testified as to the ultimate issue; rather, she left for the jury to decide whether the evidence of defendants' conduct, viewed in the context of the statutory requirements, proved beyond a reasonable doubt that defendants intentionally engaged in a fraudulent scheme to obtain money from unsuspecting purchasers and shareholders (*see, United States v Duncan*, 42 F3d 97, 100-103 [2d Cir 1994]; *cf., Marx & Co. v Diners' Club*, 550 F2d 505, 508-512 [2d Cir 1977], *cert denied* 434 US 861).

To the extent that the witness testified to matters of law that should, instead, have been covered in the court's instructions to the jury, we find no prejudice to defendant. The witness accurately stated the law as applicable to the circumstances of the case and never testified that defendant had committed the charged crimes or stated ultimate legal conclusions (*United States v Duncan, supra; United States v Bilzerian, supra,* at 1294). Moreover, the court's instructions to the jury included both the proviso that an expert's testimony may be accepted or rejected as the jury saw fit, and a detailed explanation of the People's burden of proving the defendant's specific intent to commit the crimes charged (*see, Hygh v Jacobs*, 961 F2d 359, 364-365 [2d Cir 1992] [while expert's testimony crossed the line of propriety, any error was harmless

in light of the strong trial evidence and the court's instructions on expert testimony]).

We also see no infirmity in the fact that the expert witness was employed by the Attorney-General, who also prosecuted this case (*see, People v Paperno*, 54 NY2d 294). The Legislature has endowed the Attorney-General with the dual responsibilities of reviewing cooperative conversion plans (General Business Law § 352-e), and also prosecuting civil and criminal violations of the Martin Act (General Business Law § 358). Under these circumstances, a member of the Attorney-General's Real Estate Finance Bureau was an appropriate witness to testify as to the conversion process and the filings defendants submitted for review. Since the record establishes that the trial prosecutor and the witness were from different bureaus, and served different functions, defendants' complaints concerning violations of the "advocate-witness" and "unsworn-witness" rules are rejected (*see*, Code of Professional Responsibility DR 5-101 [B]; DR 5-102 [22 NYCRR 1200.20, 1200.21]; *People v Paperno, supra*).

Disclosure of statements made by the expert witness in connection with an unrelated Martin Act prosecution (*see, People v Dansker*, NY County indictment No. 11454/92 [*Dansker*]) was properly denied. As the trial court found in denying defendants' CPL 330.30 motion, these statements were not exculpatory, and did not constitute *Rosario* material as they were unrelated to the events underlying the prosecution of these defendants (*People v Stern*, 226 AD2d 238, *lv denied* 88 NY2d 969; *People v Fridman*, 162 AD2d 136, *lv denied* 76 NY2d 893; *People v Gayle*, 168 AD2d 201, *lv denied* 78 NY2d 955). Furthermore, the record discloses that defense counsel sought production of these statements not merely to impeach the witness, but also to cross-examine the expert about a contrary legal ruling made by the court in the *Dansker* case. Such cross-examination would be patently improper since the appropriate legal standard to be applied is not a proper question for the jury, and other courts' rulings on the law are simply not relevant to this case.

The court properly precluded the proposed testimony of defendants' former counsel. Trial counsel's offer of proof revealed that the attorney-witness would be called to testify regarding defendants' negotiations with various lenders in order to save the buildings, and the advice given by the witness to Lurie as to the disclosure requirements of the Martin Act, both purportedly relevant to Lurie's state of mind (i.e., that he had no intent to defraud). We agree with the trial court that the majority of this testimony was not relevant since absent

disclosure of the material defaults, defendants' behind-the-scene efforts to "save" the buildings did not constitute a defense to the charges. Further, the court's ruling that Lurie's own testimony establishing reliance on counsel's advice was a prerequisite to the admission of the attorney's testimony and the proposed defense of reliance on advice of counsel was also proper (*see, Bisno v United States*, 299 F2d 711, 719-720 [9th Cir 1961], *cert denied* 370 US 952; *see also, Williamson v United States*, 207 US 425, 453; *United States v King*, 560 F2d 122, 132 [2d Cir 1977], *cert denied* 434 US 925).

The trial court properly instructed the jury over defendants' objection that two prosecution witnesses, both former employees of defendants testifying in exchange for immunity from prosecution, were accomplices as a matter of law (*see, People v Green*, 170 AD2d 1024; *People v Leon*, 121 AD2d 1, 5-6; *cf., People v DeGina*, 72 NY2d 768, 776-777; *People v Sterling*, 210 AD2d 358, *lv denied* 85 NY2d 943). The instruction did not impose any burden of proof on defendant, nor was it inconsistent with his trial strategy.

We perceive no abuse of sentencing discretion.

We have considered appellants' other arguments and find them to be without merit. Concur—Milonas, J. P., Rosenberger, Nardelli and Mazzarelli, JJ.