228 F.3d 113 (2nd Cir. 2000)
 BRETT K. LURIE, Petitioner-Appellee-Cross-Appellant, v.
BONNIE G. WITTNER, Acting Justice of the Supreme Court of the State of New York; ELIOT SPITZER, Attorney General of the State of New York; GLENN S. GOORD, Commissioner, New York State Department of Correctional Services, Respondents-Appellants-Cross-Appellees.
 Docket Nos. 99-2425, 99-2426
Nos. 1186, 1449--August Term, 1999
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: February 17, 2000
Decided: September 26, 2000
 
 Appeal and cross-appeal from a judgment of the United States District Court for the Southern District of New York (Scheindlin, J.) granting in substantial part petitioner's motion for a writ of habeas corpus.
 Affirmed in part and reversed in part. [Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 MARK M. BAKER, New York, N.Y. (Melinda Sarafa, Brafman & Ross, P.C., on the brief), for Petitioner-Appellee-Cross-Appellant.
 ROBIN A. FORSHAW, New York, N.Y. (Eliot Spitzer, Attorney General of the State of New York, Edward Johnson, Deputy Solicitor General, on the brief), for Respondents-Appellants-Cross-Appellees.
 Before: KEARSE, JACOBS, and POOLER, Circuit Judges.
 JACOBS, Circuit Judge:
 Petitioner Brett K. Lurie, the one-time sponsor and manager of five cooperative apartment buildings, misapplied the tenants' maintenance payments and sold apartment shares without disclosing the cooperative's weakened financial condition, and was convicted in New York State Supreme Court for schemes to defraud, real estate securities fraud, larceny, and offering a false instrument. Lurie moved in the United States District Court for the Southern District of New York (Scheindlin, J.) for a writ of habeas corpus pursuant to 28 U.S.C. §2254. The district court granted the motion in substantial part on two grounds:
 
 
 1
 (i) The state-court jury was presented with an interpretation of a certain relevant but uncharged real estate law that was also subject to a different interpretation. The district court ruled that this constituted a violation of the fair-notice requirement implicit in the rule of lenity, and that such a violation was of constitutional dimensions.
 
 
 2
 (ii) The state trial court ruled that Lurie could not call his former lawyer as a witness to present an advice-of-counsel defense unless Lurie first laid a testimonial foundation for such a defense. The district court ruled that this constituted an impermissible interference with Lurie's right to present a defense.
 
 
 3
 Appeal is taken by the Commissioner of the New York State Department of Corrections, the Attorney General of the State of New York, and an Acting Justice of the New York State Supreme Court (collectively, the "State") from so much of the judgment as granted the writ. Lurie cross-appeals on the ground that the preclusion of his attorney's testimony also required vacatur of the only count that the district court left standing.
 
 
 4
 The State appeals on three grounds: (i) Lurie failed to exhaust his fair-notice claim in state court; (ii) Lurie's fair-notice claim is premised on facts that implicate no constitutional issue reviewable on a petition for federal habeas relief; and (iii) the state court's refusal to permit testimony by Lurie's former lawyer did not deprive Lurie of his constitutional right to present a defense, and so was not properly subject to federal habeas relief.
 
 
 5
 For the reasons that follow, we reverse so much of the judgment of the district court as grants Lurie's petition. We affirm the remainder of the judgment.
 
 BACKGROUND
 A. Facts
 
 6
 In 1989 and 1990, Lurie was the sponsor, manager and majority shareholder of five cooperative apartment buildings in Queens County, New York. Among his wrongful acts as financial officer for the buildings, Lurie failed to make monthly payments on the mortgage; failed to pay for building maintenance, water, heating oil or taxes (with the exception of a $15,000 maintenance payment to himself); wrote checks to himself from the buildings' accounts in the amount of $435,000; ran up debts and obligations to the cooperatives that by October 1990 exceeded $1.8 million; and filed with the state an amendment to a real estate offering plan that contained materially false information.
 
 
 7
 The state concluded that these acts amounted to a knowing scheme to defraud current apartment owners and potential apartment buyers, and indicted Lurie. One group of violations--referenced as the "maintenance counts"--was based on Lurie's failure to disclose the buildings' parlous condition to minority shareholders, in violation of New York's General Business Law (the "Martin Act") and various sections of New York's Penal Law. These shareholders (i.e., the apartment owners) continued to make maintenance payments presumably in reliance on the reasonable but mistaken belief that their payments were being applied to the upkeep of the buildings and the other corporate obligations of the cooperative. A second group of violations--referenced as the "purchaser counts"--arose from Lurie's failure to disclose the buildings' financial condition to potential buyers and actual purchasers, also in violation of the Martin Act and New York's Penal Law.
 
 B. State court proceedings
 
 8
 On April 25, 1996, Lurie was convicted by a jury in the Supreme Court of the State of New York, the Hon. Bonnie G. Wittner, presiding. The relevant particulars of the trial are set forth below, in the context of the legal discussion. The counts of conviction were:
 
 
 9
 (i) eight counts of conducting a scheme to defraud in the first degree, in violation of N.Y. Penal Law §190.65(1)(b) (McKinney 1999) (the "scheme-to-defraud counts");
 
 
 10
 (ii) nine counts of intentional real estate securities fraud, in violation of the Martin Act, N.Y. Gen. Bus. Law § 352-c(5), (6) (McKinney 1996) (the "securities fraud counts");
 
 
 11
 (iii) three counts of grand larceny in the second degree, in violation of N.Y. Penal Law §155.40 (McKinney 1999);
 
 
 12
 (iv) three counts of grand larceny in the third degree, in violation of N.Y. Penal Law § 155.35 (McKinney 1999) (together with the second-degree larceny counts noted above, the "larceny counts"); and
 
 
 13
 (v) one count of offering a false instrument for filing in the first degree, in violation of N.Y. Penal Law §175.35 (McKinney 1999) (the "false instrument count").
 
 
 14
 Each count has a mens rea requirement of intent to defraud. See N.Y. Gen. Bus. Law §352-c(5), (6) (prohibiting actions done "with intent to defraud"); N.Y. Penal Law §155.05(1) (defining "steal[ing]" and "larceny" to require "intent to deprive another of property" (emphasis added)); id. §155.35 ("A person is guilty of grand larceny ... when he steals property ...." (emphasis added)); id. §155.40 (same); id. §175.35 (prohibiting actions done "with intent to defraud"); id. §190.65(1)(b) (same).
 
 
 15
 The first three scheme-to-defraud counts, as well as the securities fraud counts and the larceny counts, constitute the purchaser counts. Counts 4-8 alleging a scheme to defraud constitute the maintenance counts. The false instrument count is referenced separately.
 
 
 16
 Lurie was sentenced to two consecutive terms of imprisonment--(i) concurrent terms of one to three years on each of the maintenance counts, and (ii) concurrent terms of one to three years on each of the purchaser and false instrument counts--totaling two to six years.
 
 
 17
 The Appellate Division affirmed Lurie's conviction and sentence. See People v. Lurie, 673 N.Y.S.2d 60, 62-64 (1st Dep't 1998). The Court of Appeals denied leave to appeal on August 27, 1998. See People v. Lurie, 680 N.Y.S.2d 64 (1998) (table).
 
 C. Federal habeas review
 
 18
 In October 1998 Lurie filed his motion for a writ of habeas corpus, pleading three grounds:
 
 
 19
 (i) the state trial court violated due process when it permitted testimony by the head of the New York State Attorney General's Real Estate Finance Bureau concerning the obligations of a sponsor under the New York General Business Law;
 
 
 20
 (ii) the state trial court violated the rule of lenity by relying on, as evidence of Lurie's state of mind, Lurie's compliance with one possible interpretation of the statute governing those obligations, when the statute was susceptible to a narrower interpretation; and
 
 
 21
 (iii) the state trial court denied Lurie his constitutional right to present a defense when it refused to allow Lurie's former lawyer to testify about the advice he gave Lurie unless Lurie testified that his actions were influenced by that advice.
 
 
 22
 The district court heard oral argument on February 17, 1999, and on April 26 granted habeas relief on all counts except the false instrument count. See Lurie v. Wittner, No. 98 Civ. 7697, 1999 WL 246809 (S.D.N.Y. Apr. 26, 1999) ("Lurie I").
 
 
 23
 As to the purchaser counts: To show Lurie's intent to defraud, the state offered and the state trial court admitted testimony about certain legal obligations that are owed by a cooperative sponsor under a state statute. On habeas, the district court determined that the statute was susceptible of an alternative reading, under which Lurie's conduct would not have violated the statute, and that the rule of lenity therefore applied and required vacatur of the purchaser-count convictions. See Lurie I, 1999 WL 246809, at *5-*7.
 
 
 24
 As to the maintenance counts: The district court held that the state trial court violated Lurie's Sixth Amendment right to present a defense, because the state trial court's conditional refusal to allow testimony by Lurie's former lawyer presented Lurie with the constitutionally intolerable choice of exercising either his Fifth Amendment privilege against testifying or his Sixth Amendment right to present a defense, but not both. The court therefore vacated Lurie's maintenance convictions.[1] See Lurie I, 1999 WL 246809, at *7-*11. The district court's discussion made no mention of the false instrument count.
 
 
 25
 In response to competing motions for reconsideration, the district court withdrew its opinion; on July 1, it reinstated the previous opinion and filed a second opinion denying both motions for reconsideration. See Lurie v. Wittner, 75 F. Supp.2d 117 (S.D.N.Y. 1999) ("Lurie II"). In doing so, the district court ruled that the exclusion of testimony by Lurie's attorney did not require vacatur of the false instrument count, because the "proposed testimony [was] irrelevant to [that count] ... [and] [t]he exclusion of irrelevant evidence cannot support a violation of petitioner's Sixth Amendment right to present a defense." Id. at 120. The court declined to reconsider its ruling on the rule of lenity, its Sixth Amendment ruling, or its implied holding that Lurie had exhausted his state remedies. See id. at 121-26.
 
 DISCUSSION
 
 26
 On appeal, the State argues that: (i) Lurie never properly raised his fair-notice claim in the state courts, and that as an unexhausted claim it is an improper ground for federal habeas relief; (ii) on the merits of the fair-notice claim, the district court failed to apply the standards for federal habeas review of state convictions, and thereby recognized a new rule of constitutional law in violation of Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060 (1989); and (iii) the state trial court's evidentiary ruling on the testimony of Lurie's attorney was reasonable in light of the Supreme Court's precedent regarding the constitutionally guaranteed right to present a defense.
 
 
 27
 Lurie cross-appeals on the ground that the state court's refusal to allow his attorney to testify requires vacatur of the false instrument count.
 
 
 28
 Because Lurie's petition, filed in October 1998, postdates the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104 132, 110 Stat. 1214 (codified as amended in scattered titles of the U.S.C.), AEDPA's revisions of 28 U.S.C. §2254 govern this proceeding. See Williams v. Taylor, 529 U.S. 120 S.Ct. 1495, 1518 (2000) ("Because [petitioner] filed his petition in December 1997, [his] case is governed by the statute as amended by AEDPA."); cf. Lindh v. Murphy, 521 U.S. 320, 322-23, 117 S.Ct. 2059, 2061 (1997); Tankleff v. Senkowski, 135 F.3d 235, 242 (2d Cir. 1998) (holding that pre-AEDPA standards govern petitions filed prior to AEDPA's enactment).
 
 
 29
 This Court has jurisdiction to hear the State's appeal and Lurie's cross-appeal under 28 U.S.C. §2253(a). No certificate of appealability is necessary for the State to appeal the grant of habeas corpus relief. See Fed. R. App. P. 22(b)(3); Malchi v. Thaler, 211 F.3d 953, 956 (5th Cir. 2000); cf. Garcia v. Lewis, 188 F.3d 71, 76 n.2 (2d Cir. 1999) (dictum). The district court granted Lurie a certificate of appealability for the cross-appeal. See 28 U.S.C. §2253(c)(1)(A); Fed. R. App. P. §22(b)(1); Lozada v. United States, 107 F.3d 1011, 1016 (2d Cir. 1997), abrogated on other grounds, United States v. Perez, 129 F.3d 255 (2d Cir. 1997). Following entry of judgment on July 8, 1999, notices of appeal were timely filed by the State on July 29, 1999, and by the petitioner on August 2, 1999.
 
 
 30
 The district court's decision on a motion for a writ of habeas corpus is reviewed de novo. See Chalmers v. Mitchell, 73 F.3d 1262, 1266 (2d Cir. 1996); Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996).
 
 A. Fair notice
 
 31
 The district court ruled that, as to Lurie's conviction on the purchaser counts,
 
 
 32
 there is substantial evidence that the jury convicted petitioner not by finding the requisite intent but based solely on [a prosecution witness's interpretation of N.Y. Gen. Bus. Law §352-e(2)]. [The witness's] interpretation of section 352-e(2) was just that, an interpretation. The statute did not adequately put sponsors [of cooperative buildings] on notice that they must cease sales or face criminal liability.
 
 
 33
 Lurie I, 1999 WL 246809, at *7. The State argues that the district court incorrectly found a constitutional fair notice violation because the statute found ambiguous is not the statute Lurie was charged with violating, and that therefore the ruling was "contrary to the standard of review for habeas corpus petitions" and "established a new rule of constitutional law in violation of Teague v. Lane, 489 U.S. 288 (1989)." The State also argues that the district court erred in holding that Lurie exhausted his fair-notice claim in the state courts.
 
 1. Facts bearing on the fair-notice claim
 
 34
 The prosecution called as an expert witness Assistant Attorney General Mary DiStephan, Director of Regulatory Compliance at the Attorney General's Real Estate Finance Bureau, who testified about the state attorney general's procedures and requirements for filing and amending the real estate securities offering plans that are required for sales of real estate cooperatives. According to DiStephan, when the information in the original offering plan was no longer correct, the sponsor
 
 
 35
 would be under an obligation to give that information [i.e., the correct information] to prospective purchasers, because he's under an obligation to give full and fair disclosure. And, that means, current and updated information.
 
 
 36
 So, to the extent that any [information] of the offering plan is not current and updated and accurate and complete he must immediately amend the plan and give that information to [prospective] purchasers. [He is] [u]nder a constant obligation, not just [as to] the type of plan[] initially accepted for filing, but, throughout his selling activity, to make sure that he gives full and fair disclosure.
 
 
 37
 DiStephan testified that an amendment cannot be distributed to prospective purchasers until it is accepted for filing.
 
 
 38
 On redirect examination, DiStephan gave the testimony that is the focus of the fair-notice claim. She testified that it was standard practice for sponsors to refrain from selling apartments while an amendment to the offering plan was pending lest purchasers rely on an offering plan that the sponsor knows to be incorrect. She further testified to the attorney general's belief that a sponsor was obliged to give potential purchasers full and fair disclosure of the building's financial status and not to sell apartments on the basis of an offering plan that the sponsor knew to be materially false. In support of such an obligation, DiStephan testified that, according to the attorney general, a sponsor must refrain from selling apartments while the sponsor awaits approval of a pending amendment to the offering plan, so that buyers do not rely to their likely detriment on the unamended plan.
 
 
 39
 The statute underlying this policy was never mentioned at trial, but DiStephan's testimony about a sponsor's obligations was concededly grounded on an interpretation of New York General Business Law § 352-e(2), the text of which is set forth in the margin.[2] The wording of this provision speaks only about offering plans. DiStephan and the attorney general (as she testified) read the statute to apply as well to offering plan amendments, a reading that would impose a moratorium on sales during the pendency of an amendment to an offering plan. (Violation of §352-e(2) is a misdemeanor, see N.Y. Gen. Bus. Law §359-g(2) (McKinney 1996), but Lurie was not charged with violating that statute.)
 
 
 40
 The district court agreed with Lurie that "the rule of lenity should be applied to this case to preclude the prosecution from using section 352-e(2) as a basis for criminal sanctions." Lurie I, 1999 WL 246809, at *5. The rule of lenity was held applicable on two grounds. First, the statute speaks of offerings, and does not mention amendments. Second, Acting Justice Patricia Williams of the New York State Supreme Court had considered in another case whether sales are permissible during the pendency of an amendment and had concluded that §352-e(2) allowed them, because "while it may be the Department of Law's policy that a sponsor cease cooperative sales pending acceptance for filing of amendments, it is not a requirement of the Martin Act nor of any of the regulations promulgated pursuant thereto." People v. Dansker, Ind. #11454/92, at 10-11 (N.Y. Sup. Ct. Dec. 17, 1993).
 
 2. Exhaustion
 
 41
 The State argues that Lurie failed to exhaust his fair-notice claim. Lurie's brief on direct appeal to the Appellate Division raised six claims of error but failed to raise a claim under the rule of lenity or the requirement of fair notice. The first time Lurie invoked the rule of lenity (seeking reversal on the ground that the rule precluded application of §352-e(2) to his conduct) was in his reply brief to the Appellate Division. Lurie had earlier pointed out Justice Williams's holding on the issue of whether §352-e(2) applied to pending amendments, but only as an argument that the trial court wrongly construed §352-e(2)--not in terms of lenity or fair notice. The Appellate Division affirmed without reference to the rule of lenity.[3] See 673 N.Y.S.2d at 62-64.
 
 
 42
 Lurie again invoked the rule of lenity when he unsuccessfully sought permission to appeal to the New York Court of Appeals, but this time raised it only in a footnote.
 
 
 43
 The State argues that because Lurie raised his rule-of-lenity argument only (i) in a reply brief on direct appeal as of right, and (ii) in a footnote in a rejected bid for discretionary appeal, the argument was never properly presented before the state courts. If so, Lurie has failed to exhaust the available state-court remedies.[4]
 
 
 44
 Waiver. Lurie contends that the State waived the exhaustion issue in the following cryptic observation by government counsel in the district court hearing:
 
 
 45
 I believe in discussing the rule of lenity, I said, really, my substantive points as to the mandatory presumption aspect, i[s] that because of the Court's instruction, the jury was not required to find or accept that testimony and, therefore, it was not mandatory. . . . Mr. Baker also made these arguments. He did make these arguments in the Appellate Division.
 
 
 46
 Hearing Tr., Feb. 17, 1999, at 36 (emphasis added). The State responds that the second emphasized passage references Lurie's substantive argument in the Appellate Division that DiStephan misstated the duty of a sponsor, not any argument there that DiStephan's testimony implicated the rule of lenity.
 
 
 47
 AEDPA disfavors a state waiver of exhaustion: "A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." 28 U.S.C. §2254(b)(3); see also Mercadel v. Cain, 179 F.3d 271, 276 (5th Cir. 1999) (per curiam). Whatever counsel was saying, we do not read it as an "express" waiver of the exhaustion requirement.
 
 
 48
 Exhaustion requirement. Pursuant to AEDPA, a federal court may grant an application for a writ of habeas corpus on behalf of a state prisoner only where (i) "the applicant has exhausted the remedies available in the courts of the State," (ii) "there is an absence of available State corrective process," or (iii) "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. §2254(b)(1). (The text of the relevant provisions of 28 U.S.C. §2254 are reprinted in the margin.[5]) This AEDPA standard is substantially identical to the pre-AEDPA exhaustion standard. Compare 28 U.S.C.A. §2254(b) (West Supp. 1999), with 28 U.S.C. § 2254(b) (1994). Consistent with our pre-AEDPA standard, we "will not consider a constitutional challenge that has not been 'fairly presented' to the state courts," Ayala v. Speckard, 89 F.3d 91, 94 (2d Cir. 1996) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S.Ct. 509, 512 (1971)), rev'd in banc on other grounds, 131 F.3d 62 (2d Cir. 1997); nor will we deem a petition to be in compliance with §2254's requirements--in particular, that state courts be given the first opportunity to evaluate federal claims--unless "the nature or presentation of the claim" in the state forum was "likely to alert the court to the claim's federal nature," Daye v. Attorney Gen., 696 F.2d 186, 192 (2d Cir. 1982) (in banc).
 
 
 49
 Where there is no further state proceeding for petitioner to pursue, see 28 U.S.C. §2254(b)(1)(B)(i), or where further pursuit would be futile, see 28 U.S.C. §2254(b)(1)(B)(ii), this Court can, in certain circumstances, address the merits of a habeas petition even if it contains unexhausted claims, see 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").
 
 
 50
 State remedies. Under New York law, defendants are entitled to a single request for leave to appeal to the Court of Appeals. Collateral review of a New York conviction is available in the form of a motion to vacate the judgment. See N.Y. Crim. Proc. Law §440.10 (McKinney 1994). Here, however, Lurie has exhausted all avenues of direct appeal (including his one request for leave to appeal to the Court of Appeals), and collateral review is barred for claims that were or could have been raised on direct appeal (as could the rule of lenity). See N.Y. Crim. Proc. Law §440.10(2)(a), (c); People v. Ford, 613 N.Y.S.2d 688, 689 (2d Dep't 1994) (applying §440.10(2)(c)); People v. Skinner, 552 N.Y.S.2d 932, 934-35 (1st Dep't 1990) (applying §440.10(2)(a)); see also Bossett v. Walker, 41 F.3d 825, 829 (2d Cir. 1994). Neither further direct appeal nor collateral review is available to Lurie in the state courts.
 
 
 51
 Application to these facts. Lurie explicitly raised the fair-notice issue before two state courts. On his appeal as of right in the Appellate Division, he raised the claim in his reply brief. Under New York law, however, a claim of error first raised in a reply brief is not properly presented to the reviewing court. See People v. Ford, 513 N.Y.S.2d 106, 107 (1987) (citing State Farm Fire & Cas. Co. v. LiMauro, 481 N.Y.S.2d 90, 95 (2d Dep't 1984) ("It is beyond cavil that raising a new substantive issue of law for the first time in a reply brief is improper . . . ."), aff'd 492 N.Y.S.2d 534 (1985)); People v. Abreu, 669 N.Y.S.2d 560, 562 (1st Dep't 1998). Thus Lurie did not properly present his rule-of-lenity argument on his appeal as of right.
 
 
 52
 In his petition for leave to appeal to the New York Court of Appeals, Lurie raised his rule-of-lenity argument in a footnote. However, consideration before the Court of Appeals is discretionary review, which the Court of Appeals declined to grant. Presenting a claim for the first time to a state court of discretionary review is insufficient to exhaust the claim unless the court considers it. See Castille v. Peoples, 489 U.S. 346, 351, 109 S.Ct. 1056, 1060 (1989). Neither of Lurie's explicit references to the rule of lenity were sufficient to raise that claim properly in the New York courts.
 
 
 53
 Lurie also claims that his rule-of-lenity argument was sufficiently raised by implication in his initial brief to the Appellate Division, which pointed out that DiStephan's interpretation of §352-e(2) was contrary to the interpretation adopted by Justice Williams. He claims that this surmounts the bar set by Daye, 696 F.2d 186, which identified the following as two of the ways a petition may state the legal and factual bases of a claim: (i) asserting the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (ii) alleging a pattern of facts that is well within the mainstream of constitutional litigation. See id. at 192-93. We think it is a close call both as to whether the terms of Lurie's arguments were so particular as to require one to think of the rule of lenity, and as to whether the pattern of facts alleged falls within the usual rule-of-lenity pattern--particularly since Lurie was not charged under the contested provision (§352-e(2)), and the relevance of that law to his conviction was tangential. We need not decide that close question, however, because we ultimately find that Lurie's fair-notice claim lacks merit. See 28 U.S.C. § 2254(b)(2).
 
 3. Merits
 
 54
 Under AEDPA, a writ under § 2254 may issue on behalf of a state prisoner only if the state court's ruling is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The Supreme Court recently illuminated this standard in Williams v. Taylor, 529 U.S. , 120 S.Ct. 1495 (2000).[6]
 
 
 55
 Before considering any conflict between the state court ruling and Supreme Court precedent, we must first decide whether Lurie's claim is based on a principle of Supreme Court caselaw that was "clearly established" when the state court ruled. See id. at 1511 ("The threshold question under AEDPA is whether [petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final."). Moreover, the phrase "clearly established Federal law, as determined by the Supreme Court" refers only "to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Id. at 1523; accord Welch v. City of Pratt, 214 F.3d 1219, 1222 (10th Cir. 2000).
 
 
 56
 The rule of lenity is that "[i]n criminal prosecutions ... ambiguities in [a] statute [are] resolved in the defendant's favor." United States v. Plaza Health Labs., Inc., 3 F.3d 643, 649 (2d Cir. 1993). It is "reserved ... for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to 'the language and structure, legislative history, and motivating policies' of the statute." Moskal v. United States, 498 U.S. 103, 108, 111 S.Ct. 461, 465 (1990) (quoting Bifulco v. United States, 447 U.S. 381, 387, 100 S. Ct. 2247, 2252 (1980)). Such a persisting ambiguity "should be resolved in favor of lenity." Liparota v. United States, 471 U.S. 419, 427, 105 S.Ct. 2084, 2089 (1985) (quoting Rewis v. United States, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059 (1971)) (internal quotation marks omitted); see also United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 222, 73 S.Ct. 227, 229 (1952) ("We should not derive criminal outlawry from some ambiguous implication.").
 
 
 57
 The rule of lenity is a canon of statutory construction, not in itself federal law. See United States v. Torres-Echavarria, 129 F.3d 692, 698 n.2 (2d Cir. 1997); United States v. Harris, 959 F.2d 246, 258 (D.C. Cir. 1992). Federal courts cannot apply such a canon of construction to state statutes except to serve a federal constitutional interest. The rule of lenity, however, is called into service to protect the constitutional right to fair warning: "Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal ...." Liparota, 471 U.S. at 427, 105 S.Ct. at 2089 (emphasis added). As the Supreme Court has explained:
 
 
 58
 There are three related manifestations of the fair warning requirement. First, the vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application. Second, as a sort of junior version of the vagueness doctrine, the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered. Third, although clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope. In each of these guises, the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.
 
 
 59
 United States v. Lanier, 520 U.S. 259, 266-67, 117 S.Ct. 1219, 1225 (1997) (emphasis added) (citing, inter alia, Kolender v. Lawson, 461 U.S. 352, 355-57, 103 S. Ct. 1855, 1856-58 (1983), and Bouie v. City of Columbia, 378 U.S. 347, 353-54, 357-59, 84 S.Ct. 1697, 1702-06 (1964)) (citations and internal quotation marks omitted).
 
 
 60
 Fair notice, of course, is a right of federal constitutional dimension, grounded in the due process guarantee, established by the Supreme Court, and requiring that a criminal statute "give fair warning of the conduct that it makes a crime." Bouie, 378 U.S. at 350, 84 S.Ct. at 1701; see also Connally v. General Constr. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127 (1926) (striking down on due process grounds a state criminal statute that was insufficiently "explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties").
 
 
 61
 On the ground that the rule of lenity is a canon of construction rather than a federal law, at least two circuits have determined--and we see no Supreme Court caselaw to the contrary--that federal courts cannot vacate a state conviction on lenity grounds unless a state criminal statute (i) is unconstitutionally vague, or (ii) otherwise fails to give constitutionally required "fair notice." See Poole v. Wood, 45 F.3d 246, 249 (8th Cir. 1995) (vagueness); Sabetti v. DiPaolo, 16 F.3d 16, 19 (1st Cir. 1994) (fair notice).
 
 
 62
 The constitutional guarantee that a criminal defendant have been afforded "fair notice" of the possibility that the contested behavior is deemed criminal was well-established and clearly recognized at the time of Lurie's conviction. See, e.g., Bouie, 378 U.S. at 350-51, 84 S.Ct. at 1701. Lurie's rule-of-lenity claim is clearly premised on that constitutional right. Under the AEDPA standard, Lurie's claim is therefore asserted on the basis of federal law of sufficient clarity and authority.
 
 
 63
 It remains for us to decide whether the challenged ruling of the state trial court was "contrary to" such federal law or an "unreasonable application" of it. In determining whether a state prisoner is entitled to federal habeas relief because his conviction "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," §2254(d)(1), we "give independent meaning to both the 'contrary to' and 'unreasonable application' clauses of the statute." Williams v. Taylor, 120 S.Ct. at 1519; accord Clark v. Stinson, 214 F.3d 315, 320 (2d Cir. 2000). We do so because (as the Supreme Court has observed):
 
 
 64
 Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court. Under the statute, a federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States."
 
 
 65
 Williams v. Taylor, 120 S.Ct. at 1519 (quoting §2254(d)(1)); see also Sacco v. Cooksey, 214 F.3d 270, 273 (2d Cir. 2000) (per curiam). Otherwise (i.e., if the "contrary to" language were read to cover state-court decisions that involve only incorrect application of Supreme Court precedents), the "unreasonable application" language of §2254 would be rendered "a nullity." Williams v. Taylor, 120 S.Ct. at 1520; cf. Ratzlaf v. United States, 510 U.S. 135, 140-41, 114 S.Ct. 655, 659 (1994) (stating that "[j]udges should hesitate" before treating statutory language as "surplusage"). Thus two questions are posed: Was the state court's decision "contrary to" the Supreme Court's rulings on fair notice? If not, was it an "unreasonable application of" those precedents?
 
 
 66
 a. "Contrary to" precedent
 
 
 67
 A state court decision is "contrary to" existing Supreme Court precedent (i) when it applies a rule of law "that contradicts the governing law set forth in" the Supreme Court's cases, Williams v. Taylor, 120 S.Ct. at 1519, or (ii) when it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Supreme Court's] precedent," id. at 1519-20. Accord Clark, 214 F.3d at 320; Hameen v. Delaware, 212 F.3d 226, 235 (3d Cir. 2000).
 
 
 68
 In either event, a state court ruling is "contrary to" Supreme Court precedent only if it is "'diametrically different,' 'opposite in character or nature,' or 'mutually opposed'" to the precedential holding. Williams v. Taylor, 120 S.Ct. at 1519 (quoting Webster's Third New International Dictionary 495 (1976)).
 
 
 69
 The wrinkle here is that Lurie was not charged with a violation of the statute (§ 352-e(2)) as to which he claims notice was unfair. Lurie claims that the introduction of DiStephan's testimony regarding sponsors' obligations, as informed by §352-e(2), was "contrary to" the Supreme Court's fair-notice caselaw. The district court agreed with Lurie that DiStephan's testimony allowed the jury to convict Lurie without finding that he had the requisite mens rea for the crime:
 
 
 70
 Here, there is substantial evidence that the jury convicted petitioner not by finding the requisite intent but based solely on DiStephan's ... interpretation of section 352-e(2) .... The statute did not adequately put sponsors on notice that they must cease sales or face criminal liability. ... [S]ection 352-e(2) arguably formed the predicate for petitioner's conviction .... Lurie v. Wittner, No. 98 Civ. 7697, 1999 WL 246809, at *7 (S.D.N.Y. Apr. 26, 1999) ("Lurie I").
 
 
 71
 None of the Supreme Court cases cited by Lurie presents "a set of facts that are materially indistinguishable from" the facts presented on this appeal. Williams v. Taylor, 120 S.Ct. at 1519-20. All of them involved the applicability of the fair-notice requirement (sometimes via the rule of lenity) to the very statute that defined the charged crime. See Lanier, 520 U.S. at 261, 264-72, 117 S.Ct. at 1222, 1224-28; Liparota, 471 U.S. at 421-33, 105 S.Ct. at 2086-92; Kolender, 461 U.S. at 354, 357-62, 103 S.Ct. at 1856, 1858-60; Rabe v. Washington, 405 U.S. 313, 314-16, 92 S.Ct. 993, 993-94 (1972) (per curiam); United States v. Bass, 404 U.S. 336, 337, 339-47, 92 S.Ct. 515, 517, 518-22 (1971); Rewis v. United States, 401 U.S. 808, 809, 811-12, 91 S.Ct. 1056, 1058-60 (1971); Bouie, 378 U.S. at 349, 355-61, 84 S.Ct. at 1700, 1703-06; United States v. Harriss, 347 U.S. 612, 613, 617-624, 74 S.Ct. 808, 810, 812-15 (1954); United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 218-26, 73 S.Ct. 227, 228-31 (1952); Lanzetta v. New Jersey, 306 U.S. 451, 452-58, 59 S.Ct. 618, 618-21 (1939); McBoyle v. United States, 283 U.S. 25, 25-27, 51 S.Ct. 340, 340-41 (1931); Connally, 269 U.S. at 388-95, 46 S.Ct. at 126-29; cf. Hughey v. United States, 495 U.S. 411, 413, 422, 110 S.Ct. 1979, 1981, 1985 (1990) (adopting the narrower of two possible interpretations of a provision governing restitution remedies); Crandon v. United States, 494 U.S. 152, 158, 110 S.Ct. 997, 1001-02 (1990) (applying the rule of lenity in a civil suit where the standard for liability was set forth in a criminal statute); Marks v. United States, 430 U.S. 188, 191-92, 97 S.Ct. 990, 992-93 (1977) (justifying the non-retroactivity of a judicial precedent by reference to the requirement of fair warning).
 
 
 72
 The other way a state court decision could be "contrary to ... clearly established Federal law, as recognized by the Supreme Court," is for the court to apply a rule of law "that contradicts the governing law set forth in" Supreme Court precedent. Williams v. Taylor, 120 S.Ct. at 1519. The only way the New York courts could have applied a rule of law that contradicts the governing law set forth in the Supreme Court's fair-notice precedents would have been to uphold a defendant's conviction for a crime where the defendant could not have discerned the scope of the convicting law's prohibitions even by searching the statutory and other laws defining the alleged crime. See Moskal v. United States, 498 U.S. 103, 108, 111 S.Ct. 461, 465 (1990). On this appeal, however, Lurie does not even assert that the statutes under which he was charged were ambiguous. It therefore cannot be said that the New York courts applied a rule of law "that contradicts the governing law set forth in" Supreme Court precedent. Williams v. Taylor, 120 S.Ct. at 1519.
 
 
 73
 Accordingly, the state court's decision was not "contrary to ... clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. §2254(d)(1).
 
 
 74
 b. "Unreasonable application of" precedent
 
 
 75
 Where the state-court decision is not directly opposed to Supreme Court precedent, but involves an application of the high court's caselaw, federal habeas petitions are judged under the "unreasonable application" standard. In Williams v. Taylor, the Supreme Court clarified the reasonableness standard in two ways:
 
 
 76
 First, the reasonableness of an application of federal law is judged by an objective standard. See Williams v. Taylor, 120 S.Ct. at 1521-22. Rather than decide reasonableness by reference to the decisions of "all reasonable jurists," which might lead a federal habeas court to "rest[] its determination ... on the simple fact that at least one of the Nation's jurists has applied the relevant federal law in the same manner the state court did," federal courts "should ask whether the state court's application of clearly established federal law was objectively unreasonable." Id.; see also Clark, 214 F.3d at 320-21; Barnabei v. Angelone, 214 F.3d 463, 469 (4th Cir. 2000).
 
 
 77
 Second, an unreasonable application of federal law is different from an application that is simply incorrect or erroneous. See Williams v. Taylor, 120 S.Ct. at 1522-23. The Court emphasized that:
 
 
 78
 In § 2254(d)(1), Congress specifically used the word "unreasonable," and not a term like "erroneous" or "incorrect." Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.
 
 
 79
 120 S.Ct. at 1522; accord Hameen, 212 F.3d at 235.
 
 
 80
 The Supreme Court also somewhat clarified what it means for a state-court decision to be an "unreasonable application of ... clearly established Federal law, as determined by the Supreme Court." In particular, Williams v. Taylor considered a prisoner's claim that the "state-court decision ... correctly identifie[d] the governing legal rule but applie[d] it unreasonably to the facts of [the] particular prisoner's case." 120 S.Ct. at 1520; accord Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000). The Supreme Court ruled that under the proper standard for evaluating claims of "unreasonable application," such a claim, if valid, "certainly would qualify as a decision 'involv[ing] an unreasonable application of ... clearly established Federal law.'" Williams v. Taylor, 120 S.Ct. at 1520 (alterations in original); accord Clark, 214 F.3d at 320.
 
 
 81
 The present appeal, however, presents a slightly different question. While Williams v. Taylor involved the reasonableness of the application of a legal principle that clearly governed the set of facts presented, see 120 S.Ct. at 1511 (ruling that "the merits of [petitioner's] claim are squarely governed by" Supreme Court precedent), on this appeal petitioner would have us extend the Supreme Court's fair-notice caselaw to situations materially different from those considered in the high court's precedents. Specifically, petitioner contends that it was objectively unreasonable for the state courts to refuse to apply the Supreme Court's fair-notice precedents, which deal with ambiguity in the statute defining the charged offense, to a situation in which the state prisoner was not charged with violation of the ambiguous statute.
 
 
 82
 In Williams v. Taylor, the Supreme Court explicitly declined to determine whether an unreasonable refusal to extend a constitutional doctrine is sufficient to warrant federal habeas relief under AEDPA:
 
 
 83
 The Fourth Circuit also held in [Green v. French, 143 F.3d 865, 869-70 (4th Cir. 1998),] that state-court decisions that unreasonably extend a legal principle from our precedent to a new context where it should not apply (or unreasonably refuse to extend a legal principle to a new context where it should apply) should be analyzed under §2254(d)(1)'s "unreasonable application" clause. Although that holding may perhaps be correct, the classification does have some problems of precision. ... Today's case does not require us to decide how such "extension of legal principle" cases should be treated under § 2254(d)(1). For now it is sufficient to hold that when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case, a federal court applying § 2254(d)(1) may conclude that the state-court decision falls within that provision's "unreasonable application" clause.
 
 
 84
 Id. at 1521 (emphasis added; citation omitted); accord Clark, 214 F.3d at 320. (Justice O'Connor's elaboration on the "problems of precision" presented by the Fourth Circuit's holding is set forth in the margin.[7])
 
 
 85
 In a recent plurality opinion that announced the judgment of the Supreme Court, four Justices agreed that "[a] state determination may be set aside under [AEDPA's] standard if, under clearly established federal law, the state court was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled." Ramdass v. Angelone, 530 U.S., 120 S.Ct. 2113, 2120 (2000) (plurality opinion of Kennedy, J., in which Rehnquist, C.J., and Scalia and Thomas, JJ., join). This proposition failed to command a majority of the Court. See id. at 2127 (O'Connor, J., concurring in the judgment) (agreeing with the plurality that the state court's decision "was neither contrary to, nor an unreasonable application of," Supreme Court law, but restating the AEDPA standard for herself with reference to Williams v. Taylor, which declined to answer this question); id. at 2142 (Stevens, J., with whom Souter, Ginsburg and Breyer, JJ., join, dissenting) (opining that the state court's decision was "contrary to" established Supreme Court precedent). Justice O'Connor's opinion is arguably more narrow than the plurality's and therefore constitutes the holding of the Court. See Marks, 430 U.S. at 193, 97 S.Ct. at 993 (ruling that, where no opinion earns a majority, the holding of the Court is that position taken by the Justice or Justices who concurred in the judgment on the narrowest ground).
 
 
 86
 Because we ultimately determine that the state court's application of the fair-notice precedents was not "objectively unreasonable," see post, at 44-49, we decline to decide on this appeal whether unreasonable refusals to extend Supreme Court precedents are sufficient to satisfy AEDPA's requirement of an "unreasonable application of" Supreme Court caselaw. Instead, we assume arguendo that an unreasonable refusal to extend a Supreme Court precedent to cover other situations would satisfy §2254(d)(1), and move on to examine whether the "refusal to extend" challenged here was unreasonable.
 
 
 87
 In all of the Supreme Court fair-notice precedents petitioner cites, the defendant was charged under the allegedly ambiguous statute. See ante, at 34-35 (listing cases). Here, however, Lurie was not charged with violation of §352-e(2), and the implications of that provision were introduced only on redirect examination, to demonstrate that the attorney general's office believed that it was the sponsor's obligation to disclose material changes in the offering plan to buyers, who would otherwise rely on the materially false offering plan. Thus Lurie's claim is not that the statute under which he was charged was phrased such that he could not know his actions to be illegal. Rather, he relies on a more attenuated theory:
 
 
 88
 (i) The fraud statutes under which Lurie were charged were clear enough, see ante, at 6-7 (listing the statutes under which Lurie was charged);
 
 
 89
 (ii) however, the jury was allowed to infer that Lurie's behavior was fraudulent on the basis of an official's testimony as to the state's understanding of Lurie's obligations under one particular uncharged statute of the state real estate securities fraud laws;
 
 
 90
 (iii) therefore, because the interpretation offered was the broader of (at least) two plausible interpretations of the uncharged statute, and because Lurie's actions would not have violated that particular statute under the narrower interpretation, the jury was not entitled to consider his noncompliance with the broader interpretation in its deliberations as to Lurie's intent to defraud potential investors in violation of the charged statutes.
 
 
 91
 Lurie is asking this Court to hold that it is "objectively unreasonable" for state courts to receive evidence bearing on a defendant's state of mind where (i) that evidence takes the form of testimony as to the defendant's legal obligations under uncharged statutes, and (ii) those legal obligations are subject to a less expansive interpretation, under which the defendant was in compliance with those specific obligations.
 
 
 92
 This is a cantilevered extension of the Supreme Court's fair-notice precedents, which focus on ambiguities in the charged violation. On this appeal, we need not decide that such an extension is never warranted; rather, we conclude that the state courts' decision to decline such extension on these facts cannot be considered "objectively unreasonable."
 
 
 93
 The requirement of fair notice is justified by the concern that defendants will be convicted of "criminal outlawry" based not on a clearly proscribed crime, but instead based upon a theory "derive[d] ... from some ambiguous implication" of the statute defining the crime. United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 222, 73 S.Ct. 227, 229 (1952). That concern is not implicated here. Lurie was charged under statutes proscribing "fraud" and "larceny"--not violation of §352-e(2). Actions in derogation of §352-e(2) are neither necessary nor sufficient to convict a defendant of fraud in connection with real estate securities, and we see no evidence here the jury considered them to be so in convicting Lurie.[8] The Appellate Division made that point in its opinion on Lurie's direct appeal:
 
 
 94
 [DiStephan] explained the conversion process and the statutory requirements, and informed the jury of the nature and timing of defendants' disclosures. She never testified as to the ultimate issue; rather, she left for the jury to decide whether the evidence of defendants' conduct, viewed in the context of the statutory requirements, proved beyond a reasonable doubt that defendants intentionally engaged in a fraudulent scheme to obtain money from unsuspecting purchasers and shareholders.
 
 
 95
 People v. Lurie, 673 N.Y.S.2d 60, 63 (1st Dep't 1998). Lurie contends that the jury might have concluded that Lurie was violating "the statutory requirements" and therefore--ipso facto--committing fraud. But there is no reason to think that the jury believed that Lurie's purported (but uncharged) violation of this technical statutory requirement was itself sufficient to demonstrate knowing, intentional fraud.[9]
 
 
 96
 The state court ruling challenged by Lurie is evidentiary in character. Lurie was a sponsor of a cooperative real estate venture regulated by the attorney general, and DiStephan's testimony expressed the attorney general's regulatory policy. That testimony was admitted to show that Lurie, as a commercial participant in the regulated industry, would know that he was deviating from industry norms and the conventional understanding of the real estate securities disclosure laws. And that showing is arguably relevant to whether Lurie harbored fraudulent intent in deciding to sell apartments, because (i) it evidences the common understanding of the sponsor's obligation to potential purchasers, and (ii) it confirms the intuition that selling apartments on the basis of an offering plan that one knows to be materially false is inconsistent with full and fair disclosure to purchasers and consistent with fraudulent intent.
 
 
 97
 That ruling may have been sound or not. But the question here is whether that ruling was "objectively unreasonable" in light of the extant Supreme Court fair-notice caselaw. We conclude that it was not.
 
 
 98
 Introduction of the regulatory assumption did not preclude Lurie's introduction of evidence that he believed that the disclosure laws allowed him to sell during the pendency of an amendment. More important, it did not preclude the jury from determining that Lurie's conduct was inept and uninformed rather than fraudulent, or that (even if Lurie believed himself to be in technical compliance with the disclosure laws) his sale of apartments to buyers who were relying on information he knew to be materially false was nonetheless fraudulent. DiStephan's testimony notwithstanding, the jury was still required to find Lurie guilty of fraud only if it determined that he fulfilled the mens rea requirement of the charged crimes.
 
 
 99
 In short, the evidentiary ruling may have been sound or not, but the refusal by the New York courts to apply the rule of lenity to a statute that was neither charged nor mentioned at trial is not an "unreasonable application" of Supreme Court precedent. The district court does not demonstrate that its decision is an application of Supreme Court precedents in terms of AEDPA's requirements.[10] We therefore reverse, and hold that the refusal of the New York courts to apply the Supreme Court's fair-notice guarantees in this attenuated context did not amount to an "unreasonable application" of Supreme Court precedent.
 
 B. Advice-of-counsel defense
 
 100
 Lurie made an unsolicited offer of proof at trial that his former attorney Richard Koral would testify to, inter alia, the advice he had given Lurie.[11] Lurie argued that this testimony would bear upon his state of mind at the time of the alleged crimes, and would demonstrate that he had relied on advice of counsel concerning disclosure and filing requirements.
 
 
 101
 The trial court conditionally excluded Koral's testimony on the ground that Koral's testimony as to advice he had given Lurie was irrelevant without Lurie's testimony as to his actual state of mind. The district court's ground for the grant of Lurie's habeas petition as to the maintenance counts (and, apparently, an alternate ground as to the purchaser counts) is that the trial court's ruling deprived Lurie of his constitutionally guaranteed right to present a defense. According to the district court, the trial judge thus "forc[ed] [Lurie] to forfeit his fifth amendment right not to testify so that his attorney could testify," and violated Lurie's Sixth Amendment right to present a defense by requiring the sacrifice of one constitutional right (not to testify) as a condition for the exercise of another. Lurie v. Wittner, No. 98 Civ. 7697, 1999 WL 246809, at *7-*9 (S.D.N.Y. Apr. 26, 1999) ("Lurie I"). The district court concluded that this was "'intolerable.'" See id. at *7 (quoting Simmons v. United States, 390 U.S. 377, 394, 88 S.Ct. 967, 976 (1968)) (internal quotation marks omitted).
 
 
 102
 The State contends that the New York trial court properly required Lurie to lay the foundation for the advice-of-counsel testimony, and that doing so before allowing the attorney to testify "strikes a rational and fair balance between a defendant's right to present a defense and the state's interest in precluding potentially confusing and irrelevant testimony."
 
 
 103
 As the district court concluded: "Because there is no Supreme Court rule that mandates the admission of the type of evidence in dispute here, it cannot be said that the state-court decision is 'contrary to' clearly established Federal law as determined by the Supreme Court." Lurie v. Wittner, 75 F. Supp.2d 117, 124 (S.D.N.Y. 1999) ("Lurie II"). The next inquiry, as the district court properly identified it,
 
 
 104
 is whether the state court decision was based on an "unreasonable application of" Supreme Court precedent. This entails identifying the applicable Supreme Court precedent. The applicable precedent ... firmly establishes a defendant's right to present a complete and full defense subject only to reasonable restrictions. It is against this precedent that the state court decision must be judged.
 
 
 105
 Id. at 124-25 (footnote omitted).
 
 
 106
 The Sixth Amendment right to present a defense is "not unqualified; [it is] subject to 'countervailing public interests.'" Buie v. Sullivan, 923 F.2d 10, 11 (2d Cir. 1990) (quoting Taylor v. Illinois, 484 U.S. 400, 414, 108 S.Ct. 646, 656 (1988)). Even relevant testimony can be excluded, depending upon circumstances, without offending due process. See Montana v. Egelhoff, 518 U.S. 37, 42 n.1, 116 S.Ct. 2013, 2017 n.1 (1996) (plurality opinion of Scalia, J.) (noting the agreement of at least eight justices on this proposition, despite a 4-1-4 split); see also id. at 42, 116 S.Ct. at 2017 (Scalia, J., with whom Rehnquist, C.J., and Kennedy and Thomas, JJ., join) ("'The accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.'" (quoting Taylor, 484 U.S. at 410, 108 S.Ct. at 653) (alteration in original)); id. at 62, 116 S.Ct. at 2026 (O'Connor, J., dissenting, with whom Stevens, Souter and Breyer, JJ., join) ("It is true that a defendant does not enjoy an absolute right to present evidence relevant to his defense.").
 
 
 107
 Specifically, it is permissible for a state court to exclude relevant evidence in order to prevent "confusion of the issues." Michigan v. Lucas, 500 U.S. 145, 149, 111 S.Ct. 1743, 1746 (1991) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435 (1986)) (internal quotation marks omitted); see also Fed. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of ... confusion of the issues[] or misleading the jury ...."). The requirement that a proper foundation be laid for the admission of evidence serves that purpose among others, and is well established. See, e.g., Old Chief v. United States, 519 U.S. 172, 178-80 & nn.3 & 4, 117 S.Ct. 644, 649-50 & nn.3 & 4 (1997) (citing Fed. R. Evid. 402).
 
 
 108
 The state trial court's reason for the conditional exclusion of Koral's testimony--"that Lurie's own testimony establishing reliance on counsel's advice was a prerequisite to the admission of the attorney's testimony and the proposed defense of reliance on advice of counsel," People v. Lurie, 673 N.Y.S.2d at 64--is properly characterized as foundational.
 
 
 109
 There is no Supreme Court precedent requiring that an advice-of-counsel defense be allowed in state court; indeed, the situations in which the advice-of-counsel defense may be employed are severely limited. See, e.g., United States v. King, 560 F.2d 122, 132 (2d Cir. 1977).
 
 
 110
 More fundamentally, Koral's testimony was immaterial. Koral purportedly would have testified to "what was done concerning the filing of various amendments and why they were filed ... [and] the interpretation by Mr. Lurie's attorneys as to the amendments and what was required to be filed by way of financial disclosure." But even if Lurie was following advice of counsel in attempting to comply with §352-e(2)'s technical requirements regarding disclosure to the state, that effort would not rebut the overwhelming evidence that Lurie failed to make full and fair disclosure to apartment owners and would-be purchasers: "A person is not absolved of willful wrongdoing because he relied on his attorney's advice." Application of Second Additional Grand Jury, 202 N.Y.S.2d 26, 39 (2d Dep't 1960) (citing People v. Marcus, 261 N.Y. 268, 277 (1933)). As the state trial judge told Lurie's counsel: "You keep saying [this crime] is about late filing. I keep saying it is about two weeks of testimony about what people did or did not know, disclosure, fraud, deceit and concealment. That is what the crime is about."
 
 
 111
 The trial court's judgment may (or may not) have been correct as a matter of state law, but we conclude that it was not "contrary to" Supreme Court precedent or an "unreasonable application" thereof.
 
 C. Lurie's cross-appeal
 
 112
 Lurie claims that the district court's ruling with respect to the advice-of-counsel testimony requires vacatur of the false instrument count "just as the [d]istrict [c]ourt found [it did] with respect to the remainder of the charges." We have held here, however, that the preclusion of Lurie's attorney's testimony does not require vacatur of "the remainder of the charges"; so even if we agree with Lurie that the false instrument count must be treated identically to the maintenance counts, such identical treatment here does not require vacatur of the false instrument count.
 
 CONCLUSION
 
 113
 For the reasons stated above, we reverse the judgment of the district court insofar as it granted Lurie's petition for a writ of habeas corpus and affirm the judgment insofar as it denied that petition. The docket sheet reflects that on November 5, 1998, the district court stayed "all proceedings in furtherance of petitioner's surrender to the New York State Department of Correctional Services," and prohibited respondents from "undertak[ing] any efforts to cause petitioner to be taken into custody." If that stay is still in effect, it is hereby vacated.
 
 
 
 NOTES:
 
 
 [1]
 The district court overturned the purchaser-count convictions before it considered the maintenance-count convictions, so it is unclear whether the court believed that the habeas relief warranted by the preclusion of the lawyer's testimony would extend to the purchaser counts as well as the maintenance counts.
 
 
 [2]
 That provision reads in pertinent part:
 Unless otherwise provided by the regulation issued by the attorney general, the offering statement or statements or prospectus required in subdivision one of this section shall be filed with the department of law at its office in the city of New York, prior to the public offering of the security involved. No offer, advertisement or sale of such securities shall be made in or from the state of New York until the attorney general has issued to the issuer or other offeror a letter stating that the offering has been filed.
 N.Y. Gen. Bus. Law § 352-e(2) (McKinney 1996) (emphasis added).
 
 
 [3]
 Lurie's brief on this appeal states that "[a] motion to reargue, which again raised the issue of the Rule of Lenity, was also denied." We see no such motion, and the brief does not undertake to explain why such a motion would matter for present purposes.
 
 
 [4]
 The State also emphasizes that the rule of lenity is a statutory presumption lacking a constitutional dimension, and that invocation of the rule, even if properly presented, therefore was ineffective notice of the federal nature of the claim. As discussed below, see post, at 28-31, however, the Supreme Court has said that the rule of lenity protects a defendant's right to fair warning, and recognized a due process aspect of fair warning. See Liparota v. United States, 471 U.S. 419, 427, 105 S. Ct. 2084, 2089 (1985).
 
 
 [5]
 The provisions of § 2254 that are relevant to exhaustion of state remedies are as follows:
 (b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that
 (A) the applicant has exhausted the remedies available in the courts of the State;
 or
 (B)(i) there is an absence of available State corrective process; or
 (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.
 (2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.
 (3) A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.
 (c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.
 28 U.S.C. § 2254.
 
 
 [6]
 To avert unnecessary confusion, two cautions may be useful:
 1. The Williams v. Taylor discussed here was one of two cases titled Williams v. Taylor decided by the Supreme Court on April 18, 2000. Compare Williams v. Taylor, 529 U.S. , 120 S. Ct. 1495 (2000) (Petitioner Terry Williams), with Williams v. Taylor, 529 U.S. , 120 S. Ct. 1479 (2000) (Petitioner Michael Wayne Williams).
 2. The Williams v. Taylor opinion discussed in the body of the opinion was decided by a split majority: Justice Stevens's opinion was joined by five other Justices in three of its five parts, see 120 S. Ct. at 1499-503, 1511-16 (Parts I, III, and IV of the opinion of Stevens, J., in which O'Connor, Kennedy, Souter, Ginsburg and Breyer, JJ., join), while Justice O'Connor's opinion was joined by four other Justices for the point--particularly relevant to this appeal--delineating the proper standard for federal habeas review, see 120 S. Ct. at 1518-23 (Part II of the opinion of O'Connor, J., in which Rehnquist, C.J., and Kennedy and Thomas, JJ., join, and in which Scalia, J., joins except as to the footnote).
 
 
 [7]
 Regarding the "problems of precision" created by the treatment of unreasonable extensions and refusals to extend as "unreasonable applications," the Court stated that:
 Just as it is sometimes difficult to distinguish a mixed question of law and fact from a question of fact, it will often be difficult to identify separately those state-court decisions that involve an unreasonable application of a legal principle (or an unreasonable failure to apply a legal principle) to a new context. Indeed, on the one hand, in some cases it will be hard to distinguish a decision involving an unreasonable extension of a legal principle from a decision involving an unreasonable application of law to facts. On the other hand, in many of the same cases it will also be difficult to distinguish a decision involving an unreasonable extension of a legal principle from a decision that arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[.]
 Williams v. Taylor, 120 S. Ct. at 1521 (internal quotation marks omitted).
 
 
 [8]
 Though Judge Scheindlin asserts that there is "substantial evidence" that DiStephan's testimony substituted for a jury finding of intent, she cites none. After a searching review of the record and the district court opinion, the only evidence we find is a request by the jury during deliberations regarding DiStephan's testimony about the propriety of selling real estate securities at various times.
 
 
 [9]
 As the district court observed: "The jury was free to accord whatever weight it chose to DiStephan's . . . testimony. The fact that the jury may have given [her] testimony inordinate weight does not constitute a due process violation."
 
 
 [10]
 The district court opinion relies heavily on United States v. D'Alessio, 822 F. Supp. 1134 (D.N.J. 1993). D'Alessio was decided by a federal district court, not the Supreme Court; and in any event it contains no analysis that would justify the grant of habeas in favor of Lurie. In that case, a county sheriff was charged with, inter alia, mail fraud for allegedly violating local taxpayers' intangible right to his honest services. See id. at 1137. The indictment charged that the sheriff used the mails to violate Rule 1:16-2 of the Rules Governing the Courts of the State of New Jersey, in violation of 18 U.S.C. §§ 1341, 1342. See 822 F. Supp. at 1137-38, 1140-45. Violation of the New Jersey court rule was thus the sine qua non of the mail fraud charge; if the court rule did not apply to sheriffs, then the predicate for the mail fraud charge did not exist.
 In Lurie's case, for reasons stated earlier in this opinion, the linkage between § 352-e(2) and the charged fraud and larceny provisions is decidedly more attenuated.
 
 
 [11]
 Counsel for Lurie also suggested four other areas about which Koral would testify. The trial court, however, concluded that each was irrelevant and refused to allow Koral to testify to them. Those determinations are not challenged on this habeas petition.