Thomas **DALLIO**, Petitioner,

v.

Eliot **SPITZER**, New York State Attorney General, and Michael McGinnis, Superintendent, Southport Correctional Facility, Respondents.

No. 00 CV 1572.

United States District Court, E.D. New York.

Oct. 26, 2001.

William B. Carney, The Legal Aid Society Criminal Appeals Bureau, New York, NY, for petitioner.

Richard A. Brown, District Attorney, Queens County by John M. Castellano,

Lisa Drury, Assistant District Attorneys, Kew Gardens, NY, for respondents.

### MEMORANDUM AND ORDER

BLOCK, District Judge.

Petitioner, Thomas Dallio ("Dallio") seeks a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. On October 15, 1991, Dallio confessed to robbing and murdering Loni Berglund ("Berglund") in her home in Queens on January 10, 1986. Dallio's motion to suppress the confession was denied by the Supreme Court, Queens County, on August 3, 1995, after a hearing. Thereafter, on November 13, 1995, Dallio pled guilty to two counts of murder in the second degree, N.Y. Penal Law § 125.25[1], [3], one count of robbery in the first degree, N.Y. Penal Law § 160.15[2], and one count of criminal possession of a weapon in the second degree, N.Y. Penal Law § 265.03. Dallio is concurrently serving two sentences of twenty-two years to life on the murder counts, and two sentences of five-to-fifteen years on the other counts. Dallio contends that he is entitled to *habeas* relief because: (1) he was deprived of his Sixth Amendment right to counsel at the suppression hearing when, toward the end of the hearing, he elected to represent himself but the court failed to warn him of the dangers and disadvantages of doing so; (2) his right to remain silent and "cut off questioning was [not] scrupulously honored," Pet. Mem. and App. at 46; and (3) his confession was not voluntarily obtained. For the reasons set forth below, the petition is denied.

### BACKGROUND

#### I.

The following facts are taken from the suppression hearing: In May 1991, during a continuing investigation into the Berglund murder, fingerprints recovered from the crime scene were analyzed on the newly-installed Statewide Automatic Fingerprint Identification System (SAFIS). Dallio's prints came up as a match. On October 15, 1991, Dallio was visited at the Shawangunk Correctional Facility ("Shawangunk") by the investigators assigned to the Berglund case, Sergeant Timothy Copeland ("Copeland") and Detective Raymond Pierce ("Pierce"). At the time, Dallio was serving a six-to-twelve year sentence for a 1988 robbery conviction.

According to Copeland, Dallio was escorted to a room for questioning at approximately 11:25 a.m., a guard was posted outside the room, and at approximately 11:30 a.m., Dallio was given *Miranda* warnings. Dallio stated that he understood his rights and signed a waiver of his right to counsel and to remain silent. After approximately forty minutes of inquiry, Copeland asked Dallio if he would agree to tape recording their conversation. Dallio stated "I don't know if I should talk on the tape without representation." Tr. at 15 (June 9, 1993).[1] Copeland then asked Dallio "what do you mean by representation? Do you mean someone from jail?" *Id.* When Dallio did not respond, Copeland asked "do you want a lawyer or what?" *Id.* Dallio responded "no, I don't know what I want." *Id.* Pierce also asked Dallio "do you want a lawyer?" *Id.* Dallio replied "no, no, I'll talk to you," but not on tape. *Id.* The officers then put the tape recorder away and the inquiry continued.

After a short time, Copeland again asked Dallio if he would go on tape. This time he agreed. During the course of the

---

1. All "Tr." references are to the transcript of the hearing. Because the hearing took place over several days, and the page numbering begins anew with each date, each reference will include the particular date testimony was given.

questioning the officers focused on whether Dallio had ever been to Queens County, where the murder took place. Dallio stated that his only connection to Queens County was his godmother because that was where she resided. The officers then began asking questions about Dallio's godmother. When the officers mentioned her name, however, Dallio became visibly upset and put a hand up, as if motioning for the tape to be stopped. After the taping ceased, Dallio stated that he did not want the officers to "bring [his] godmother into this." *Id.* at 20. While the tape was off, Dallio was also shown some photographs of Berglund and her residence. Dallio calmed down after a few minutes and Copeland restarted the tape. The questioning then focused on Dallio's previous burglaries. Dallio once again became visibly upset, made a hand gesture, and asked that the tape be turned off. Off the tape, the officers continued to talk with Dallio about his prior criminal activities, as well as his childhood. After engaging in such conversation for about an hour or so, and after Dallio returned from a forty-five minute escorted trip to the bathroom, Copeland told Dallio that his fingerprints had been found at the crime scene. Dallio did not believe him. Thereafter, Pierce asked Dallio "what if I was to tell you that they were [found] in blood."[2] Tr. at 18 (Sept. 16, 1993).

Copeland then told Dallio that Berglund's mother was a forgiving and religious woman. Dallio finally agreed to talk and said "I'll tell you, but I'm not telling you for you, I'm telling you for Mrs. Berglund, for her sake." Tr. at 33 (June 10, 1993). Shortly thereafter, at approximately 4:30 p.m., Dallio agreed to resume taping their conversation. Dallio then confessed on

tape to the Berglund murder. Copeland then left the room and returned with a video recorder. Upon his return, Copeland read Dallio his *Miranda* rights again. Dallio waived his rights and gave a video confession.

About six months later, on April 8, 1992, Dallio was arrested for the Berglund murder. On the way to the police precinct from Riker's Island, Dallio asked the officers "listen, you already know through my confession that I killed Loni Berglund. Do you think I should get the death penalty?" *Id.* at 44. Copeland stated that he thought he would, and Dallio stated "I killed her in a drug-crazed state. I didn't mean to do it. I think I should get manslaughter not murder." *Id.* Dallio also said "if it wasn't for that confession and the prints you say you have on me, you wouldn't have anything. What I told you and Detective Pierce was for Mrs. Berglund's sake, nobody else's." *Id.* at 45.

## II.

The suppression hearing covered seven days throughout the course of almost two years.[3] Copeland and Pierce testified at the hearing. On April 19, 1995, after the government had rested, Dallio's counsel, John O'Grady ("O'Grady"), informed the court that Dallio wished to proceed *pro se*. O'Grady stated:

> We had an in-depth conversation. [Dallio] feels that he is very familiar with the manner in which to proceed on this hearing, and how he wants to handle Detective Copeland, and he has expressed reservations about how prior counsel handled this matter. In my opinion, your Honor, he is competent—

---

**2.** Although it was true that Dallio's fingerprints were found at the scene, it was not true that they were found in blood.

**3.** The dates were: June 9–10, 1993; September 14 and 16, 1993; March 30, 1995; April 19, 1995; and May 18, 1995.

well, I don't know if he is competent to proceed pro se, your Honor, as an attorney. He is certainly competent to make that decision, and as such, I think he wishes to address the Court and has a number of issues to address to the Court on this matter. If the Court would hear my client.

Pet. Mem. and App. at A5. The government objected on the ground that the request to proceed *pro se* was a delaying tactic. Dallio then addressed the court under oath: Dallio explained that O'Grady was his second lawyer. His first lawyer, Joseph V. DiBlasi ("DiBlasi"), represented him at the portion of the hearing conducted from June 9, 1993 through September 16, 1993. Sometime thereafter, Dallio made a motion for new counsel because he believed that DiBlasi was not representing him adequately. Specifically, Dallio questioned DiBlasi's impeachment of Copeland, claiming that DiBlasi did not lay a foundation to test his credibility by introducing dozens of inconsistent statements. In December 1994 the motion was granted and O'Grady was assigned.

In requesting to proceed *pro se*, Dallio also criticized O'Grady, explaining that O'Grady did not pick up the case file until March 1995. Dallio also claimed that O'Grady had never seen the crime scene photographs, which Dallio thought were "relevant to a particular issue during the interrogation." *Id.* at A9. Furthermore, Dallio was dissatisfied with O'Grady's intention to raise only one issue in the memorandum of law in support of suppression. Without any further colloquy, the court simply asked Dallio: "are you ready to proceed now?" Tr. at 68 (Apr. 19, 1995). Dallio responded "yes," and the court stated "you may proceed." *Id.* Dallio continued *pro se* for the remainder of the hearing. O'Grady, however, remained in the courtroom throughout the duration of the hearing as stand-by counsel.

Dallio re-called Copeland and Pierce. Dallio also called Scott Willis ("Willis"), a correction officer at Shawangunk. Willis testified that according to his log book Dallio was still in his cell at 11:30 a.m., the time that Copeland testified that Dallio had signed his first Miranda waiver. On rebuttal, the government called correction officer Edward Carroll, who testified that he escorted Dallio from his cell to the interrogation room at approximately 11:40 a.m., thus marginalizing Copeland's contrary testimony.

### III.

After the hearing concluded, the court made the following findings of fact: "[Dallio] was advised of his Miranda rights and agreed to speak to the detectives and signed the Miranda card. During the course of the next few hours, [Dallio] made two separate statements which were recorded on audio tape and video tape. In these statements, [Dallio] admitted to shooting Loni Berglund." *People v. Dallio*, No. 1368–92, at 2 (N.Y.Sup.Ct. Aug. 3, 1995). Furthermore, the court found that during the car ride from Riker's Island to the precinct for arraignment, Dallio "made further statements to Sergeant Copeland. None of these statements were preceded by any questions or statements which might induce the defendant to make a statement." *Id.* The court concluded that Dallio "knowingly, intelligently and voluntarily waived his right to counsel, and effectively communicated this waiver to Sergeant Copeland." *Id.* Accordingly, the suppression motion was denied.

On appeal, Dallio, represented by new counsel, argued, in regard to the hearing, that (1) the People failed to prove the following: (a) he did not invoke his right to counsel; (b) his right to remain silent was scrupulously honored; and (c) his state-

ments were voluntarily obtained; (2) the court did not advise him of the dangers and disadvantages of proceeding *pro se.* Dallio also argued that the sentence was excessive. In respect to the merits of Dallio's claims, the Appellate Division determined that the "defendant did not unequivocally request the assistance of counsel and, therefore, his statement to the police should not be suppressed." *People v. Dallio,* 256 A.D.2d 417, 682 N.Y.S.2d 233, 234 (2d Dep't 1998). The Appellate Division further stated that Dallio's sentence was not excessive, and rejected his remaining contentions, without comment, as meritless.[4]

Upon timely application, permission to appeal to the New York Court of Appeals was denied, and denied again upon reconsideration. *See People v. Dallio,* 93 N.Y.2d 872, 689 N.Y.S.2d 434, 711 N.E.2d 648 (1999). Dallio timely filed his *habeas* petition on March 15, 2000. In the petition, Dallio raises the same arguments he raised on direct appeal, except he does not challenge his sentence as excessive.

## DISCUSSION

### I. Standard of Review

■ Although Dallio was convicted on December 13, 1995, because his petition postdates the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), AEDPA's revisions of 28 U.S.C. § 2254 govern. *See Williams v. Taylor,* 529 U.S. 362, 403, 120 S.Ct. 1495, 1518, 146 L.Ed.2d 389 (2000); *see also Lurie v. Wittner,* 228 F.3d 113, 120–21 (2d Cir.2000). AEDPA provides the guide-

lines under which a federal *habeas* court may grant a writ pursuant to § 2254 for violations of a federal constitutional right, provided that the underlying federal claim was adjudicated on the merits by the state court. *See* 28 U.S.C. § 2254; *see also Williams,* 120 S.Ct. at 1518–22. Pursuant to § 2254, *habeas* relief may not be granted unless the state court decision: (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

■ A state court decision is "contrary to" clearly established Federal law "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives" at a different result. *Williams,* 120 S.Ct. at 1519. A state court decision involves an "unreasonable application" of Supreme Court precedent if it unreasonably applies a governing legal rule to the particular facts of a case. *See id.* at 1521. This requires a *habeas* court to "ask whether the state court's application of clearly established federal law was objectively unreasonable," not whether the application was erroneous or incorrect. *Id.* at 1521–22; *see also Clark v. Stinson,* 214 F.3d 315, 320–21 (2d Cir.2000). As further guidance, the Second Circuit has explained that although " 'some increment

---

4. The Appellate Division initially remanded the case to the trial court "to report its findings of fact and conclusions of law in accordance with CPL 710.60(6)." *People v. Dallio,* 671 N.Y.S.2d 985 (2d Dept.1998) (noting that CPL 710.60(6) requires a court to set forth on the record its findings of fact, its conclusions

of law, and the reasons for its determination). However, upon learning that the trial judge had subsequently retired, the appellate court decided that it was in the best position to make credibility findings. Therefore, it vacated its previous order and proceeded to the merits.

of incorrectness beyond error is required ... the increment need not be great.'" *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir.2001) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir.2000)).

## II. Right to Self–Representation

■ Dallio contends that his Sixth Amendment right to counsel was violated when the hearing court failed to ensure that Dallio knowingly and intelligently elected to proceed *pro se*. The clearly established Supreme Court law regarding the right to self-representation is set forth in *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). In *Faretta*, the Supreme Court determined that a defendant has a constitutional right to represent himself in a criminal proceeding, but "in order to represent himself, the accused must 'knowingly and intelligently' forgo" the right to counsel. *Id.* at 835, 95 S.Ct. 2525 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464–65, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). In that regard, the Court stated that "[a]lthough a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes wide open.'" *Id.* (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942)).

■ *Faretta* dictates that there be some inquiry into the defendant's ability to represent himself. *See United States v. Tompkins*, 623 F.2d 824, 828 (2d Cir.1980); *see also Cruz v. Miller*, 255 F.3d 77, 85 (2d Cir.2001) (on *habeas* review under AEDPA it is appropriate to examine how the federal courts of appeals have applied the clearly established Supreme Court law to dif-

fering fact patterns). "The determination of whether a defendant's election is knowing and intelligent depends on the particular facts and circumstances of the case, 'including the background, experience, and conduct of the accused.'" *United States v. Tracy*, 12 F.3d 1186, 1191–92 (2d Cir.1993) (quoting *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (internal citation omitted)). It should be evident that the defendant has the capacity for making a rational decision. *See id.* (citing *Faretta*, 422 U.S. at 835, 95 S.Ct. 2525). The court and "the defendant should engage in a colloquy on the record, but there is no scripted procedure for this discussion." *United States v. Fore*, 169 F.3d 104, 108 (2d Cir.1999). There should be a " 'full and calm discussion' with the defendant," the content of which may include "the nature of the charges, the range of allowable punishments, and the risks of self-representation." *Id.* (internal citations and quotations omitted).

■ Here, the Appellate Division summarily determined that Dallio's *Faretta* claim was without merit. Although, as noted, there is no rigid procedure for advising a defendant about the ramifications of proceeding *pro se*, *Faretta* requires, at a minimum, that there must be an explanation of the attendant dangers and disadvantages. The trial court did not do this. The court merely asked Dallio if he was ready to proceed after Dallio explained why he was unhappy with assigned counsel. Dallio's explanation, although articulate and intelligent, did not inform the court as to his background and experience, nor did it go to his knowledge of the nature of the charges, the range of punishments, or the risks involved. The record is devoid of any indication that Dallio understood the dangers and disadvantages of the choice he was making. Accordingly, the Court concludes that the Appellate

Division's decision amounted to an unreasonable application of clearly established Supreme Court law.

However, the inquiry does not end with this determination. The Court must consider "whether the constitutional error justifies the writ without regard to prejudice," known as structural error, or "falls into the larger class of constitutional errors that is subject to harmless error review." *Lainfiesta v. Artuz,* 253 F.3d 151, 156–57 (2d Cir.2001). Structural error occurs where the defect "affect[s] the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Id.* at 157. Structural error is "*per se* reversible." *Peck v. United States,* 106 F.3d 450, 454 (2d Cir.1997).

Whether it is structural error when a court fails to advise a defendant of the ramifications of proceeding *pro se,* appears to be a question of first impression. However, "[t]he Supreme Court has held that violations of the Sixth Amendment right to counsel are *per se* reversible only when they amount to an actual or constructive denial of the assistance of counsel altogether, or when counsel was prevented from assisting the accused during a critical stage of the proceeding." *Lainfiesta,* 253 F.3d at 157 (internal quotations and citations to Supreme Court authority omitted); *see, e.g., McKaskle v. Wiggins,* 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) (denial of self-representation at trial is structural error); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (complete denial of counsel is structural error); *Bellamy v. Cogdell,* 974 F.2d 302 (2d Cir.1992) (recognizing a *per se* ineffective assistance of counsel rule where, unbeknownst to the defendant, counsel was not duly licensed to practice law at the time of representation because of a failure to meet the substantive requirements for the practice of law, or was

implicated in the defendant's crimes) (internal quotations and citations omitted). Otherwise, Sixth Amendment violations have invariably been held subject to harmless error analysis. *See, e.g., Lainfiesta,* 253 F.3d at 157 (recognizing that the arbitrary deprivation of a second attorney of choice is a constitutional violation subject to harmless error analysis) (citing cases); *Coleman v. Alabama,* 399 U.S. 1, 10–11, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970) (holding that deprivation of counsel at a preliminary hearing is a Sixth Amendment violation and remanding to the state courts to consider whether the error was harmless). As the present case falls into neither of the rare situations warranting automatic reversal, Dallio's claim is subject to harmless error analysis.

In applying the harmless error standard, the Court must consider whether the error had a " 'substantial and injurious effect or influence' " on the outcome. *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)); *see Nova v. Bartlett,* 211 F.3d 705, 709 (2d Cir.2000). To make such a showing, the *habeas* petitioner must establish that the constitutional claim "resulted in actual prejudice." *Id.* (citing *United States v. Lane,* 474 U.S. 438, 449, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986)). If a federal judge in a *habeas* proceeding is in grave doubt as to the harmlessness of the error, meaning that "the matter is so evenly balanced that he feels himself in virtual equipoise," then the error should be treated as if it affected the outcome. *O'Neal v. McAninch,* 513 U.S. 432, 435, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995).

Although the standard set forth in *Brecht* arose in the context of a jury trial, the standard is equally applica-

ble to proceedings conducted by a judge. *See Beets v. Iowa Dep't of Corr. Servs.*, 164 F.3d 1131, 1136 (8th Cir.1999) (applying harmless error analysis on *habeas* review to bench trial). As an initial matter, the Court notes that Dallio, upon electing to proceed *pro se,* was not actually or constructively deprived of the assistance of counsel altogether since O'Grady was present on stand-by throughout the remainder of the hearing. *See McKaskle,* 465 U.S. at 187–88, 104 S.Ct. 944 (courts are permitted to appoint standby counsel-who must generally respect defendant's right to appear *pro se,* but need not be excluded altogether). Furthermore, by the time Dallio elected to proceed *pro se,* the majority of the hearing had taken place. Pierce and Copeland each had testified on direct-examination and cross-examination. Dallio had already received the benefit of counsel's skilled and thorough examinations of these witnesses. In addition, Dallio ably represented himself by re-crossing Pierce and Copeland, and questioning Willis in an attempt to undermine the credibility of the investigating officers. Any failure by the court to warn Dallio of the dangers and disadvantages of proceeding *pro se* did not have a substantial and injurious effect on the outcome of the hearing. Therefore, the Court concludes that although the error was constitutional in dimension, the claim fails under harmless error analysis.

### III. Challenges to Confession

 The Supreme Court has held that "the ultimate question, whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a matter for independent federal determination." *Miller v. Fenton,* 474 U.S. 104, 112, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). However, a state court's determinations of "subsidiary questions such as the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the Miranda warnings" are considered questions of fact, which are entitled to a presumption of correctness under 28 U.S.C. § 2254(d). *Id.* at 117, 106 S.Ct. 445. In the face of the required presumption, the petitioner " 'shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.' " *Nelson v. Walker,* 121 F.3d 828, 833 n. 4 (2d Cir.1997) (quoting 28 U.S.C. § 2254(e)(1)).

### A. *Invocation of Right to Counsel*

 Under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), custodial interrogations are prohibited without prior warning of the Fifth Amendment privilege against self-incrimination. "Once in the custody of law enforcement officials, an accused must be informed of his constitutional rights to remain silent, and to counsel." *Campaneria,* 891 F.2d at 1022 (2d Cir.1989) (citing *Colorado v. Spring,* 479 U.S. 564, 572–72, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987)). "An accused is in 'custody' when, in the absence of an actual arrest, law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave." *Id.* Whether someone is in custody depends on the totality of the circumstances. *See Thompson v. Keohane,* 516 U.S. 99, 113, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). If a person in custody chooses to remain silent, the admissibility of statements obtained thereafter will depend on "whether his 'right to cut off questioning' was 'scrupulously honored.' " *Mosley,* 423 U.S. at 104, 96 S.Ct. 321 (quoting *Miranda,* 384 U.S. at 474, 86 S.Ct. 1602).

 The questioning of an incarcerated prisoner is not a *per se* custodial

interrogation for the purposes of *Miranda.* See *Illinois v. Perkins,* 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990) (conversation between suspect and undercover agent in prison did not implicate *Miranda*). However, under the circumstances here, it is clear that Dallio was in custody. He was detained in a private room, with a guard posted outside the door, and was not permitted to go to the bathroom unaccompanied. Clearly, any attempts by Dallio to exit the room would have been thwarted. In this "police-dominated atmosphere," a reasonable person in Dallio's position would not have felt free to leave. *Miranda,* 384 U.S. at 445, 86 S.Ct. 1602.

■ Nevertheless, the strictures of *Miranda* were adequately observed. Dallio was read his rights shortly after he was brought into the room. He acknowledged those rights and waived them. At no point did Dallio choose to remain silent by exercising his right to cut off questioning. Although, over the course of the day, Dallio stated on several occasions that he did not wish to talk on tape, this was not tantamount to a request for legal representation. To the contrary, he stated that he did not want a lawyer. Dallio freely and voluntarily continued discussions with the officers off-tape. His hand signals and requests to stop were only in regard to the recording, not the questioning. On these facts, the Appellate Division specifically found that Dallio agreed to speak to the officers after signing the *Miranda* waiver. Dallio has not rebutted the presumption of correctness that should be accorded this finding.

### B. Voluntariness of Confession

■ Dallio further contends that his confession was not voluntarily obtained. Supreme Court precedent requires a court to determine the voluntari-

ness of a statement based on "the totality of all the surrounding circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). " 'No single criterion controls whether an accused's confession is voluntary.' " *Nelson,* 121 F.3d at 833 (quoting *Green v. Scully,* 850 F.2d 894, 901 (2d Cir.1988)). A confession is voluntary if it "is the product of an essentially free and unconstrained choice and involuntary if the product of a will overborne." *Mancusi v. Clayton,* 454 F.2d 454, 456 (2d Cir.1972) (citing *Lynumn v. Illinois,* 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963)). Factors to be considered include: the characteristics of the accused, such as his experience, background, and education; the conditions of the interrogation; and the conduct of the law enforcement officials, notably, whether there was physical abuse, the period of restraint in handcuffs, and use of psychologically coercive tactics, including whether police engaged in trickery. *See id.; Green,* 850 F.2d at 901.

■ According to Dallio, his will was overborne by the officers when they preyed on his religious beliefs, lied to him about his fingerprints being found in blood, and lied about whether Berglund's mother would forgive him. The Appellate Division found this claim to be without merit, and the Court agrees. There was no indication of physical abuse, nor was Dallio handcuffed. The conditions of the interrogation consisted of Dallio and two officers sitting in a room; there is nothing inherently coercive about such a situation. In addition, Dallio was no stranger to the law. Dallio was incarcerated at the time and had a lengthy criminal history; thus, he was familiar with police interrogation tactics and unlikely to be confused or overwhelmed.

■ Furthermore, the fact that Dallio claims he was deceived by one of the

**340**

officers is insufficient to render his confession involuntary. "The fact ... that the police lie to a suspect to elicit his confession does not necessarily render it involuntary;" again, the Court must consider the totality of the circumstances. *Santiago Ortiz v. Kelly,* 687 F.Supp. 64, 66 (E.D.N.Y.1988) (citing *Green v. Scully,* 850 F.2d 894 (2d Cir.1988)); *see also Colorado v. Spring,* 107 S.Ct. at 858 n. 8 (declining to outlaw all trickery); *Tankleff v. Senkowski,* 135 F.3d 235, 242–243 (2d Cir. 1998). Here, Dallio was not lied to; the officer merely asked what would happen if he were to tell Dallio that the prints were found in blood. Since Dallio has not even alleged that an affirmative misrepresentation was made, the Court finds that under these circumstances, his confession was voluntary. Finally, Dallio again voluntarily confessed to the murder when he was on his way to the precinct. Therefore, according the factual findings the appropriate presumption of correctness, Dallio's involuntariness claim must fail.[5]

## CONCLUSION

The petition is denied. The Court determines that a certificate of appealability will not be issued since Dallio has failed to make a substantial showing of the denial of a federal right. *See* 28 U.S.C. § 2253.

**SO ORDERED.**

---

**5.** The government contends that the voluntariness claim is procedurally barred because Dallio did not raise it in his application to the New York Court of Appeals. The government is incorrect. In his letter to the Court of Appeals, Dallio specifically requested that the court consider all of the claims raised in his appellate brief. Dallio attached a copy of the brief to the letter application. Included in his appellate brief was a claim that the confession was not voluntarily obtained. An express statement in a letter to the Court of Appeals asking it to consider and review all issues raised in the appellate brief is "sufficiently specific to alert the Court of Appeals" to the issues being raised. *Morgan v. Bennett,* 204 F.3d 360, 370–71 (2d Cir.2000).