**AMERICAN SAMOA GOVERNMENT, Plaintiff,**

**v.**

**MAELI PITOITUA aka ISUMU, Defendant,**

High Court of American Samoa
Trial Division

CR No. 33-04

February 28, 2005

60

Before KRUSE, Chief Justice; and ATIULAGI, Associate Judge.

Counsel: For Plaintiff, Jeremy Kirkland, Assistant Attorney General
For Defendant, Aviata F. Fa`alevao, Public Defender

### ORDER DENYING DEFENDANT'S MOTION
### TO QUASH AND MOTION TO SUPPRESS

#### Background

Plaintiff American Samoa Government ("ASG") alleges that on January 23, 2004, defendant Maeli Pitoitua ("Pitoitua") murdered a fellow inmate and gravely assaulted another at the Tafuna Correctional Facility ("TCF"). Several days after the incident, on January 27, 2004, Officer John Cendrowski ("Officer Cendrowski") of the Department of Public Safety interviewed Pitoitua at the TCF and elicited a written statement. On July 8, 2004, the District Court Judge held a preliminary examination hearing on the matter and determined that probable cause existed to charge Pitoitua with the crimes of Murder in the First Degree and Assault in the First Degree.

On December 29, 2004, Pitoitua filed the present motion asserting that the District Court Judge violated his Sixth Amendment right to confrontation by admitting hearsay evidence in the preliminary examination hearing, and additionally asserting that his written statement was given involuntarily in violation of his Fifth Amendment right against self-incrimination.

## Discussion

### I. Sixth Amendment Right to Confrontation

At the preliminary examination hearing on July 8, 2004, before the District Court Judge, the sole witness was Officer Cendrowski who arrived at the TCF shortly after the incident and conducted an investigation at the scene of the alleged crimes. Because Officer Cendrowski was not personally present during the alleged murder and assault, much of his testimony was necessarily based upon what other inmates had relayed to him during his investigation. While Pitoitua's attorney had objected to the hearsay nature of Officer Cendrowski's testimony, the District Court Judge overruled those objections relying on Rule 5.1 of the Trial Court Rules of Criminal Procedure, which provides that "[t]he finding of probable cause may be based upon hearsay evidence . . . ."

In the current motion, Pitoitua renews his objection to Officer Cendrowski's hearsay testimony asserting a violation of his Sixth Amendment right to confrontation.[1] For the reasons stated below, we find that no such violation exists.

Pitoitua bases his Confrontation Clause claim on the recent United States Supreme Court decision in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct 1354 (2004). In that landmark case, the Supreme Court held that out-of-court "testimonial" statements of a witness are barred from trial, under the Confrontation Clause, unless 1) the witness was unavailable to testify, and 2) the defendant had a prior opportunity to cross-examine that witness. Pitoitua claims that he was denied his right to confrontation at his preliminary examination when Officer Cendrowski was allowed to reference statements by out-of-court inmate witnesses who were otherwise available to testify.[2]

---

[1] The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."

[2] In American Samoa's criminal justice system, unlike in the federal grand jury system, a defendant is permitted to question witnesses during the probable cause hearing. T.C.R.Cr.P. 5.1.

■ However, there is a major flaw in Pitoitua's argument: the Confrontation Clause applies only to criminal trials—not to preliminary examination hearings. The Supreme Court has very clearly stated that the right to confrontation does not attach until trial. In *Barber v Page*, 390 U.S. 719, 725 (1968), the Court held that "the right to confrontation is basically a trial right." The Court in *Pennsylvania v. Ritchie*, 480 U.S. 39, 53 (1987) stated that "[t]he opinions of this Court show that the right to confrontation is a *trial* right. . . ." *Id.* (emphasis in the original). *See also California v. Green*, 399 U.S. 149, 157 (1970) (stating that "it is this literal right to 'confront' the witness at the time of trial that forms the core values furthered by the Confrontation Clause"); *People v. Miranda*, 96 Cal. Rptr.2d 758 (Cal. 2000) (stating that the "preliminary hearing of [that] state sufficiently resembles the Fourth Amendment probable cause hearing ... to meet federal confrontation clause standards despite reliance on hearsay evidence").

In *Am. Samoa Gov't v. Foma`i*, 1 A.S.R.2d 61 (Trial Div. 1982), this court, in rejecting the defendant's claim that the exclusionary rule applied in preliminary examination hearings, explained the role of the District Court Judge in preliminary examination hearings as that akin to the Federal Magistrate's; and that is,

> the District Court Judge ... merely decides whether or not a defendant should be held for trial ... A magistrate exercises no trial jurisdiction when conducting a preliminary examination. This is not simply a matter of semantics. It is basic and fundamental. The magistrate acts as an arm of the High Court in winnowing groundless and needless cases that would otherwise appear before the High Court and ascertains that only those against whom probable cause has been shown should be held for trial. The magistrate acts as a substitute for a constitutionally mandated grand jury. The only distinction is one which inures to the benefit of the defendant inasmuch as he is allowed to cross examine witnesses at a preliminary examination and is not allowed to do so before a grand jury.

*Id.* at 63.

In the present matter, we find ourselves in a parallel situation with Pitoitua's confrontation claim. As with the *Foma`i* court, we hold that the probable cause hearing is simply a preliminary investigative hearing where the District Court Judge neutrally observes the evidence to determine if the government has probable cause to pursue their case against the defendant.

To properly undertake his responsibility, the District Court Judge, like the grand jury, must have access to evidence, unimpeded by safeguards that were designed to protect the defendant at trial.

With *Crawford,* the Supreme Court left no indication that it meant to modify the above referenced precedents so as to extend the reach of the Confrontation Clause to include preliminary examination hearings. The hearsay evidence involved in *Crawford* was introduced at trial, not at a preliminary examination hearing. The claim therefore that the Court extended its Confrontation Clause limitations to preliminary hearings is tenuous. The Supreme Court does not often leave such important constitutional limitations open to question, instead, it typically spells them out with some clarity and explicitness. If the Court had called for limiting hearsay evidence in non-trial hearings, it would have said so. Moreover, the history behind the Confrontation Clause reveals that its primary objective was to ensure that convictions are not obtained through the use of *ex parte* testimony. *Crawford,* 124 S.Ct. at 1363. But a criminal defendant is convicted at trial, not at the probable cause hearing,[3] and, therefore, as long as a court properly limits hearsay evidence at trial, the spirit of the Confrontation Clause is not violated. The defendant will eventually be allowed to question the hearsay declarant at trial or be allowed keep that evidence out of the courtroom if the hearsay declarant is unavailable.

Lastly, the Supreme Court obviously did not intend *Crawford* to materially alter the federal grand jury system, overturning long-standing federal statutory law. Under Federal Rule of Criminal Procedure 6(d)(1), neither the defendant nor his attorneys are allowed into the courtroom while the grand jury is hearing probable cause evidence. The defendant, therefore, clearly has no right to confront his accusers during probable cause hearings. Again, if the Supreme Court had intended *Crawford* to materially alter the grand jury process and to overrule Fed.R.Civ.P. 5(d)(1), it would have mentioned such in its opinion.

In sum, the constitutional right to confront one's accusers does not apply to preliminary hearings, and therefore the *Crawford* decision does not limit a court's ability to allow hearsay statements into such a hearing. Furthermore, T.C.R.Cr.P. 5.1 expressly allows such hearsay evidence into a preliminary hearing.[4] Thus, we hold that the District Court properly allowed Officer Cendrowski to discuss relevant hearsay

---

[3] *See Foma`i,* 1 A.S.R.2d at 63 ("Courts have jurisdiction to try cases. A magistrate does not.")

[4] The United State Supreme Court, in *Gerstein v. Pugh,* 420 U.S. 103, 120 (1975), has stated that hearsay evidence may be used in probable cause hearings.

statements during the probable cause hearing and that Pitoitua's motion to set aside the District Court order is without merit and is denied.

## II. Fifth Amendment Right Against Self-Incrimination

On January 27, 2004, Officer Cendrowski interviewed Pitoitua at the TCF and at the end of that interview Pitoitua produced a written self-inculpatory statement. Now, Pitoitua claims that his statement was given involuntarily.

The following facts are undisputed: At the time of the alleged crimes and the investigatory interview, Pitoitua was incarcerated at the TCF after having earlier pled guilty to an unrelated charge of first-degree assault. On January 23, 2004, two inmates and a prison guard were attacked with a large knife at the TCF. Witnesses claim that it was Pitoitua who committed the attack. Then, according to witnesses, almost immediately after the alleged incident other unharmed inmates battered Pitoitua with stones, causing him to sustain at least one large gash on his head, rendering him unconscious. Pitoitua was then taken to LBJ Tropical Medical Center (the "LBJ") for treatment of his injuries. After having received treatment at the LBJ, prison authorities brought Pitoitua back to the TCF, where they confined him in a solitary cell until January 27, 2004—the date of the interview.

Officer Cendrowski met with Pitoitua at the TCF after having interviewed other relevant witnesses who had implicated Pitoitua in the attack under investigation. At the beginning of that interview, Officer Cendrowski read Pitoitua his *Miranda* rights, as printed on a standard form waiver of rights, and then asked Pitoitua if he understood those rights. Pitoitua indicated that he did. Officer Cendrowski then urged Pitoitua to confess, saying that other inmate witnesses had implicated him in the attack. Upon hearing that news, Pitoitua produced a verbal and then written statement.

"Statements made by a defendant in response to interrogation while in police custody are not admissible unless the defendant has first been [apprised] of the constitutional right against self-incrimination and has validly waived his rights." *United States v. Cole,* 315 F.3d 633, 636 (6th Cir. 2003). If a suspect has confessed after having been apprised of his *Miranda* rights—as is the case here—the court must still ask whether, under the totality of the circumstances, the confession was voluntary, knowing and intelligent. *Moran v. Burbine,* 475 U.S. 412, 421 (1986). The inquiry involves a two-part analysis:

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice, rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude 'that the *Miranda* rights have been waived.

*Id.* (citing *Pare v. Michael C.*, 442 U.S. 707, 725 (1979)).

## A. Intimidation, Coercion, or Deception

■ After making an examination of the record and hearing testimony from the Officer Cendrowski and Pitoitua, we find that the statement was not obtained by use of intimidation, coercion or deception. There is no evidence that Officer Cendrowski threatened Pitoitua, made false promises or ever acted improper during the interview. Further, Officer Cendrowski testified that he did not reveal any weapons during the interview or physically intimidate Pitoitua in any way. At the same time, we found nothing to suggest that the setting or atmosphere of interview was such to put pressure on the Pitoitua to confess. The interrogation was held at the TCF, where Pitoitua was living, and presumably comfortable, at the time of the questioning,

Pitoitua asserts that he was coerced into signing the statement because Officer Cendrowski told him that doing so would "make [Cendrowski's] job easier." Such a trivial suggestion does not rise to the level of coercion. It is unlikely that a relatively experienced criminal under investigation for homicide would wilt under pressure of such an innocuous proposition

Pitoitua also claims that because the TCF authorities confined him in a solitary cell from the time he arrived back at the TCF from the medical center until the time of the interview, he was not in a position to refuse Officer Cendrowski's request for a statement.[5] We do not find this

---

[5] Pitoitua cites the total eighty-three day solitary confinement as evidence of coercion. However, because the statement was produced on only the third day of confinement, it is only that shorter time period that is relevant to our inquiry into the totality of the circumstances surrounding his statement. Pitoitua also alleges that while in confinement, he was beaten by TCF personnel. Again, however, because this alleged beating

argument persuasive.

Pitoitua should have known that the confinement was unrelated to the investigative goals of the police and that the possibility of continued confinement did not hinge on whether or not he confessed. *See Minnesota v. Blom,* 682 N.W.2d. 578, 615 (Minn. 2004) (holding that a confession was voluntary despite the fact that it was given while a prisoner suspect was held in solitary confinement during the time of the confession). Pitoitua also should have known that the confinement was equally intended to protect him from his fellow inmates, following the January 23 stoning incident. Pitoitua himself has expressed concern with his safety while being mixed with the general prison population, so it would seem logical that he may even have felt relieved to have been in separate quarters. (Pitoitua Aff. Nov. 22, ¶ 2). Therefore, we do not feel that the three-day confinement acted to coerce Pitoitua into confessing to the crimes.

In sum, largely in light of Officer Cendrowski's relatively subtle and straightforward interrogation, we find that Pitoitua was not intimidated, coerced or deceived into Providing a statement

B. Full Awareness of Nature and Consequences of Statement

 After making an examination of the record, considering background information and hearing testimony from the Officer Cendrowski and Pitoitua, we conclude that Pitoitua was fully aware of the nature and consequences of his statement.

There is no credible evidence to indicate that Pitoitua did not understand the nature of his rights and the consequences of his statement. Officer Cendrowski testified that Pitoitua appeared sober and alert during the interview. Also, after having his *Miranda* rights read to him, Pitoitua quickly responded that he understood those rights and then—without apparent protest or confusion—offered a statement.

Moreover, the most compelling evidence in favor of finding that Pitoitua was aware of the nature of this statement is his past experience with the criminal justice system. Courts often look to past experience with criminal proceedings in concluding that a defendant understood his *Miranda* rights. *Dallio v. Spitzer,* 170 F.Supp.2d 327, 339 (E.D.N.Y. 2001) (stating that the defendant likely understood his *Miranda* rights

---

took place a "few weeks" after the incident, it is not relevant to our inquiry because it took place after the statement was made and therefore could not have worked to coerce Pitoitua (Def.'s Mem. Supp. Mot. to Quash and Suppress at 4).

67

because he "was incarcerated at the time [of the confession] and had a lengthy criminal history; [and] thus, was familiar with police interrogation tactics and unlikely to be confused or overwhelmed"). *Louisiana v. Quest,* 772 So.2d 772, 781 (La. Ct. App. 2000); *Ohio v. Penix,* 1986 WL 9094, \*20 (Ohio Ct. App. 1986). Pitoitua is currently incarcerated at the TCF after having pled guilty to felony assault in May 1999.[6] As such, he is not exactly a newcomer to the world of police interrogation and well knows first-hand that giving a statement to the police can lead to an arrest and conviction. The record in his previous criminal case evidences just that. In the *Affidavit in Support of an Arrest Warrant* in that case, the arresting officer stated that after apprehending Pitoitua he advised him of his constitutional rights; Pitoitua then replied that he understood those rights and agreed to waive them. *(Fe`a Aff.* ¶ 7). Then, roughly twenty minutes after waiving his rights, Pitoitua agreed to provide a written statement and offered a full confession. *Id.* Presumably, the statement and the confession were a major factor in Pitoitua's decision to plead guilty to the crime. In short, we find Pitoitua's past experience with the criminal justice system to be compelling evidence that he understood the nature of his rights and the consequences of his statement.

Finally, Pitoitua claims that because of the head injury he sustained when his fellow inmates battered him with stones, he was incapable of appreciating the nature and consequences of his statement. We find this hard to believe. Even conceding for these purposes that Pitoitua's head injury was somewhat severe, we are not convinced that it was serious enough to impair his judgment three days later. Pitoitua was treated and then deemed fit for release by LBJ Medical Center staff. And, on the date of the interview, Pitoitua was coherent enough to speak with Officer Cendrowski about the incident and offered a relatively lucid written statement. Additionally, Officer Cendrowski testified that Pitoitua appeared alert and articulate during that interview. Therefore, the record simply does not support Pitoitua's claim that his head injury impaired his ability to understand the nature of his rights and the gravity of the statement.

In sum, we find that Pitoitua's statement was free from intimidation, coercion or deception and that he was fully aware of both the nature of his rights and the consequences of the statement. Therefore, we find that under the totality of the circumstances that Pitoitua's statement was voluntary, knowing and intelligent and, thus, admissible evidence at trial.

---

[6] *See Am. Samoa Gov't v. Pitoitua,* CR No. 71-98 (Trial Div. 1999).

## Order

1. Pitoitua's motion to quash and set aside the District Court finding of probable cause is denied.

2. Pitoitua's motion to suppress statements made to the police is denied.

It is so ordered.